## TOWN OF SEARCY v. YARNELL.

1. CORPORATIONS: *Their existence not assailable collaterally.*
   The existence of a corporation once formed can be questioned only by a direct proceeding; and that at the suit of the state.

| 47 | 269 |
| 58 | 103 |

| 47 | 269 |
| 61 | 402 |
| 61 | 580 |

| 47 | 269 |
| 68 | 66 |
| 68 | 141 |

| 47 | 269 |
| e76 | 59 |

| 47 | 269 |
| f81 | 247 |
| 81 | 399 |

| 47 | 269 |
| 187 | 523 |

2. SAME: *Breaches of conditions subsequent to organization.*

The failure of stockholders to pay their subscriptions, the failure to hold elections for directors, and similar omissions, are not sufficient grounds for the destruction of a corporate existence, even at the suit of the state, where the by-laws and the law of the state provide that the directors named in the charter shall serve until their successors are elected and qualified.

3. ESTOPPEL: *In pais.*

One who deals with an ostensible corporation, whereby rights become vested in it, can not afterwards question its corporate character.

4. CORPORATION: *Railroad, must have five stockholders.*

There never has been a time since the adoption of our general incorporation laws when railroad corporate rights could be owned and exercised by a sole owner. There must be five owners or there is no franchise to own; and a corporation stockholder in another corporation, though composed of many individuals, is, as a stockholder, but one person.

5. TRUSTEE: *Sale to himself; Whether void or voidable.*

There is a distinction between the case of a sale to a sole trustee and the sale to one of several trustees. Even in the case of one trustee selling the property of his *cestui que trust* to himself, the rule seems to be that the sale is void, or only voidable, according to the circumstances of the case.

6. MUNICIPAL CORPORATIONS: *Power to sell corporate property.*

A municipal corporation has power to dispose of property held for general convenience, pleasure or profit.

7. SAME: *Estoppel; Ultra vires.*

A contract of sale by a municipal corporation, which is fair and lawful and fully performed by both parties, cannot afterwards be avoided by the corporation on the ground of *ultra vires.*

8. RAILROADS: *Power of stockholders to sell.*

A majority of the stockholders of an incorporated railroad company can not sell the property of the company against the wishes of the minority and thus defeat the objects for which the company was formed.

9. SAME: *Same; The franchise.*

The directors of a railroad company may, by unanimous consent of the stockholders, sell the corporate property, and thus denude themselves of the power to exercise the rights of the franchise, and can not afterwards avoid the sale by pleading the inaliênable character of the franchise; only the state can question that.

APPEAL from *White* Circuit Court in Chancery.

Hon. M. T. SANDERS, Circuit Judge.

*Clark & Williams* and *W. R. Coody* for Appellant.

The city of Searcy never bore any relation to this railroad except that of a stockholder, and though she might, as she held a majority of the stock, authorize a sale of the road, yet it could only be through or by operation of a sale of its shares. The franchise continues under the control of the shareholders. If such sale should work a forfeiture of the franchise, still no such forfeiture has been claimed by the state and the franchise continues. *Pierce on Railroads, pp. 9, 10.*

But continues in whom? Of course in the stockholders, and the city holds the stock. See *Comm. v. So. Mass. Turnpike Co., 5 Cush., 509.*

Even under a forced sale, under execution or foreclosure of mortgage, the franchise does not pass unless by express statute, and we have no such statute in Arkansas. *Rogun v. Atkins, 9 Lea (Tenn.), 609.* No sale of the *corpus*, either judicially or otherwise, could be made; and in England such is the law now. *Furness v. Cottenham Ry. Co., 25 Beav., 614.*

And a railroad cannot be sold out as a whole even on a mortgage or fieri facias. *2 Kent Com., pp. 352–3.* And the same is the law here as to any voluntary or private sale. It is only by statute that it can be sold on mortgage or execution, although some of the states have held that it may be judicially sold independently of any such statute. See *Allen v. Montgomery Ry., 11 Ala., 437,* and *Redfield on Railways, 507, secs. 9, 17.*

There can be no pretense that Yarnell took anything under his purchase more than the possession and use of the road during such time as the stockholders should see fit to let him use it, unless the transaction can be construed as an equitable assignment of the stock; we know of no rule of law for such a construction. But, moreover, the parties never treated the sale as a transfer of the stock. Such stock was never assigned on

the books; no stockholders' or directors' meetings were ever held after the sale to Yarnell. The corporation was not used, but abandoned, from that deed; undoubtedly the state could claim a forfeiture for non-user or abandonment from the date of that sale. *Pierce on Railroads, 10, and cases cited in note 8,* especially *Comm. v. Mass. Turnpike Co., 5 Cush., 509; White v. Campbell, 5 Humph., 38.*

Passing from this view of the case, the sale to Yarnell was made, or purported to be made, by a board of directors of the Searcy Railroad Company. Now a board of directors has no power to sell the *corpus* of the company, even if the stockholders would have the power in a stockholders' meeting to do so, and there is no claim of any authority to do so by a regular stockholders' meeting; it requires the vote of a majority of the stock in a regular stockholders' meeting to borrow money and pledge the property in mortgage for its payment. No board of directors has any such power; that is to say, that the directors may sell and buy and mortgage articles of property, are rights not essential to the trust, transactions and continual existence of the corporation, and they cannot, without special authority, alienate property or rights which are essential to the transaction of the corporate business and existence. *16 Wall., 390; 33 Barb., 578; 18 Gratt., 819; 7 C. E. Green, 130, 407; 9 Id., 455; 48 Penn. St., 29; Pierce on R. R., 33.*

Yarnell was a member of the board when the sale was made and the sale was void. He was a trustee, and a trustee cannot purchase the trust property, nor deal with trust funds, or make any gain whatever out of the relationship. *Pierce on Railroads, p. 36 et seq.; 3 Watts Ac. and Def., pp. 466–7; Field on Corp. (Wood), secs. 154–5–7; 21 Wall., 616; 41 Ark., 269; 38 Id., 26; 26 Id., 445.*

But it may be argued that Yarnell was not a director at the time of the purchase. The records of the board of directors exhibited show that he was such; he fails to deny it by his

·own evidence; and the only proof is that of B. M. Jones, who ·states that Yarnell, after he concluded to purchase the road, told the board that he would resign and become the purchaser, but no action was taken by the board as to his resignation, and from the records and in fact he was a director at the time. But ·suppose he was not a director at the immediate time; he was one of the committee charged with the sale of the road, and had been a director up to the time not only when it was concluded to sell the property and it had been offered for sale, but up to a time when, after a failure to sell, Yarnell signified his wish to buy the property if he could get it for $500 and his brother would join him in the purchase; and up to the time when the offer to take $500 from him had been agreed upon in the directory he was one of the directors, and then ·only stated that he would resign for the express purpose of accepting the offer and becoming the purchaser of the road. Now, if the duties and obligations imposed by law on trustees could be thus easily avoided, they might be ignored at pleasure, and evaded at the will of the trustee; in fact, it would be no law at all. Yet the chancellor below seemed to put no stress upon this proposition. See *Field on Corp.* (*Wood*), *sec. 157; European Railway Co., v. Pour, 59 Mc., 277; Dobson v. Racey, 3 Sanf. Chy., 62; Peckett v School District, 25 Wis., 552; Cumberland Coal Co. v. Sherman, 30 Barb., 553; Boyd v. Blakeman, 29 Cal., 19; Aberdeen Railway Co. v. Blaikie, 1 McQueen, 461; Flint Ry. Co. v. Dewey, 14 Mich., 477; Fuller v. Dane, 18 Pick., 472; 33 Ark., 575.*

That directors are trustees, see *Butts v. Woods, 38 Bard., 188; York & Midland Railway Co. v. Hudson, 19 Eng. L. & Eq., 365; Scott v. Depeyster, 1 Edw. Chy., 513; Verplank v. Mercantile Insurance Co., Ib. 85; Great Sexembourg Railway Co. v. Wagner, 25 Beav., 586.*

But it is argued that the city of Searcy is estopped by its acts and conduct with reference to the sale, and that seemed

17——47

to be the main ground upon which the chancellor based his decision of the case below. But how can this be short of the full period of the statute of limitation, which is seven years as to this character of property, when no such time has elapsed? The city has done nothing that would estop her from asserting her title to this property; she has simply omitted to bring her suit for some time, the reasons for which are fully shown in the evidence of Sowell, McGinnis and others.

Here, the town being fully authorized to take stock in the railroad, issued bonds and levied taxes to pay the same under an act of the legislature, approved July 23, 1868. See *Pamphlet Acts 1868, p. 210, sec. 18; Field on Corp., Wood, secs. 52–3; 3 Wall., 327.* And no mode being pointed out as to the exercise of the authority, the matter was submitted to a vote of the citizens of the town, under an act of the legislature with reference to the subscription of stock by counties, approved July 23, 1868. *Acts 1868, pp. 312–13.*

The town, being the only stockholder who paid up its stock, was the sole owner, and the council, without the consent of the people for whose benefit it was built and paid the taxes, *had no power to sell or dispose* of the road. They could only manage it for the purposes of its creation, to-wit: To advance the welfare, etc., of the town. *Mansf. Dig., sec. 764; Field on Corp., secs. 57, 199, 207; 31 Ark., 464–5; 10 Rich. (S. C.) Law, 491.*

A municipal corporation cannot dispose of its property. *2 Dillon, secs. 445–7, 450–1; 30 Iowa, 94; 2 Dill. Corp., secs. 493 to 498; 45 N. Y., 234; Grant on Corp., 129, 134.*

The sale was *ultra vires. Green, ultra vires, p. 37; 63 N. Y., 68; 43 Iowa, 48, 65; 38 Cal., 300; 35 Mich., 22.* Said sale was void *in toto*, and the people cannot be estopped by the same. *1 Dill. Corp., secs. 383–4; 16 Cal., 282; 2. Clifford, C. C., 590–6.*

*F. W. Compton* for Appellant, with whom are *Cypert & Reeves.*

1. In subscribing to the capital stock, issuing bonds, etc., the town exceeded her powers, but having done so, the transaction, although *ultra vires*, being *executed*, she became the owner of the stock. This did not vest the title of the road in her; she was simply a stockholder, the title being in the company.

2. The deed to the purchasers of the road was properly executed. The rule of law is, that where the deed of a railroad corporation *purports* to be the deed of the corporation, the fact that it is not signed by the corporate name, but by an officer having the power to execute the deed in behalf of the company, in his individual name, does not invalidate it as the deed of the corporation (*Jones on Railroad Securities, sec. 86*); and such power (that is, to execute a deed of conveyance,) may be delegated by the board of directors to the president of the company. *Pierce on Railroads, p. 34.* Testing the deed in question by this rule, there can be no doubt of its validity. The deed not only *purports* to be the deed of the Searcy Branch Railroad Company, as expressed in the body of it, but is also signed in its name by the president of the company, who was authorized by the board of directors to do so.

3. The sale, as made and carried into effect by the railroad company, with the consent or subsequent ratification of the appellant, through her common council, is valid; notwithstanding the absence of any provision in their respective charters authorizing the exercise of such a power. The appellant being the only stockholder whose stock had been paid, and as such, the only claimant of a subsisting interest in the road, the object of the ordinance above mentioned was to express her consent to sale, by the company who held the title ; and that she not only consented to the sale, but subsequently ratified it,

is abundantly established, independent of the ordinance itself, by the proceedings of the common council, as shown by its minutes. After the sale, with full and exact knowledge of all that had been done, she received the five hundred dollars, that part of the consideration that was to be paid in cash; and through her common council granted the appellees the privilege of erecting depot buildings within her corporate limits, and the right of way along and upon her streets. Indeed, evidence of consent and ratification pervades the whole record, and leaves no doubt on the mind. Under such circumstances, a sale is valid, as held by the supreme court of the United States, in *Chicago, Rock Island and Pacific Railroad Company v. Howard, 7 Wall., 392.*

Where a contract has been entered into by a corporation, which is *ultra vires*, though it cannot be enforced while executory, yet if executed by one party, the other, who has received the benefit of it, will not be permitted to set up such want of power as a defense; and where the contract has been fully executed by both parties, the law does not allow either party to take advantage of such want of power. *63 N. Y., 62; 22 N. Y., 494; 14 N. Y., 93; 17 Barb., 378; 125 Mass., 339; 96 U. S., 341; 98 U. S., 621; 29 Ohio St., 330; 44 Iowa, 239; 47 Ind., 407.*

This rule is for the protection of rights acquired under a completed transaction, and applies to public or municipal as well as to private corporations. *Tash v. Adams, 10 Cush., 252; Alleghany v. McCluskan, 14 Penn. St., 81; Fuller v. Melrose, 1 Allen, 166; Thompson v. Lambert, 44 Iowa, 230.* See also *39 Iowa, 267.*

It is also contended for the appellant that, as W. A. Yarnell was a director of the road at the time of the sale, the purchase by him and his brother involved a breach of trust, and for that reason the sale should be avoided, and they required to account as trustees.

The railroad company does not seek to avoid the sale, and the proof shows that while efforts were being made to sell the road, Yarnell, before he submitted his offer to purchase, resigned his position as director; but, waiving any discussion as to this, and treating Yarnell as a director when the sale took place, still, under the circumstances attending the transaction, the proposition contended for cannot be maintained.

The contracts and transactions of a director which involve a breach of trust are not void, but are voidable only, at the election of the complaining party as to whom he stands in the trust relation; which right of election must be exercised in a reasonable time, and is lost by ratification or acquiescence. *Hayward v. National Bank, 96 U. S., 6 Otto, 611; Omaha Hotel Co. v. Wade, 97 U. S., 7 Otto, 13; Twin Lick Oil Co. v. Marburg, 91 U. S., 1 Otto, 587; Credit Co. v. Arkansas Cent. R. Co., 15 Fed. Reporter, 46.*

Appellant is estopped by her long acquiescence and by her subsequent ratification of the sale.

Hon. HENRY G. BUNN, *Special Judge.* In 1871, when the Cairo & Fulton, now St. Louis, Iron Mountain & Southern railway, was being located through this state, various efforts were made by the citizens of the town of Searcy, in White county, to induce the railroad people to diverge from the contemplated route so as to touch their town; and all these efforts proving fruitless, on the 21st July, 1871, some of them, nine in number, signed articles of association and caused the same to be filed in the office of the secretary of state, they having subscribed the necessary amount of stock, named their directors, their commissioners to open subscription books, and did other things required by law entitling them to file the same.

They thus became a railroad corporation under existing laws and immediately caused books of subscription to be opened and a survey of their contemplated tap or branch road to be made,

locating the same so as to have its western terminus at the town of Searcy and its eastern terminus or junction with the Cairo & Fulton railway at a point they named Kensett, a short and immaterial distance from the point named in the charter or articles of association.   The full amount of stock was subscribed, and the principal portion, amounting to twenty thousand dollars, was taken and subscribed by the town of Searcy in its corporate capacity, after the will of her citizens, qualified to vote, was taken by means of an election in itself regular; and to pay the same the bonds of the town were issued, sold, and subsequently redeemed by money raised by taxation.   Except a small amount expended for surveys, no other money was ever paid for stock subscription except that paid by the town.

Thus, under its corporate name of "The Searcy Branch Railroad Company," this corporation proceeded to build, according to the provisions of its charter and by-laws, a wooden tramway from Searcy to the Cairo & Fulton road at Kensett, and did complete and put the same in operation, employing the requisite number of coaches drawn by horse-power, at an expenditure of about eighteen thousand dollars.   Notwithstanding the fact that none of the stockholders except the town had paid anything for their stock, the affairs of the company continued to be managed by the directors named in the charter, except two who early became lessees of the road, their places being filled by the advice and consent of the town, the only *bona fide* stockholder.

The revenues derived from the annual lease of the road, amounting to about fifteen hundred dollars, less an amount expended on repairs, continued to be paid over to the town by the company.   In the early part of the year 1877, owing to rapid and increasing decay of the timbers used for the superstructure and the usual wear and tear of other portions of the road and property, it began to appear to the directors and the citizens of Searcy, that very soon the expense of repairing would absorb

and ultimately more than absorb the rents and profits of the road. The greater portion of that year was spent in efforts to dispose of the road in a manner that would save the town and the company from loss and yet serve its original purpose, and finally it was proposed to sell it on certain terms named, and failing to effect a sale after repeated efforts, the appellee, W. A. Yarnell, then one of the board of directors of the road, proposed to purchase the road on the terms previously named, with some immaterial modifications, if his brother, another one of the appellees, would unite with him in the purchase.

After consulting with his brother and finding him willing to make the purchase, W. A. Yarnell resigned his place as one of the directors and purchased the road from the other directors for the sum of five hundred dollars in cash, and for the further consideration that they, the Yarnells, should extend the road to West Point, at the head of navigation on Little Red river, a point about four or five miles east of Kensett, making the whole line about twice as long as originally established between Searcy and Kensett, and to equip the whole line with iron rails, and proper coaches drawn by steam power, and to keep the same in operation perpetually ; a maximum rate of charges for freight and passengers being fixed in the contract of sale. A deed was made by the president, by direction of the company, to the Yarnells. The Yarnells having extended the road and done other things in accordance with their contract, associated with themselves the other appellees, presumably to make the requisite number of persons, and then filed articles of association in the office of the secretary of state, and thereby became a railroad corporation under the name of "The Searcy & West Point Railroad Company," and at the institution of this suit were thus owning and operating the road, having expended almost thirty thousand dollars in the extension and equipment of the same under the conditions of their contract of purchase.

The corporate authorities of the town of Searcy instituted this action in September, 1882, to annul the sale of the road to

the Yarnells, raising sundry issues of law affecting the validity of the sale and transfer of the road, and setting up the forego- ing facts in support of its complaint, denying that the town ever assented to the sale, and alleging that W. A. Yarnell, by reason of his position and influence, gained an undue advantage over the town, and that the town was powerless to assert her rights until she did so.

1. CORPORA- TIONS: Their existence not assailable col- laterally.

There is little controversy as to the facts in this case; the controversy is mainly upon the effect of admitted facts and the questions of law applicable thereto. The appellant denies that the town of Searcy, as the sole stockholder, assented to and authorized the sale, but we think it is fairly established that she did. And we apprehend that the denial is more upon the ad- missibility than upon the directions and strength of the evidence adduced. It goes without controversy that up to the time when the town of Searcy became a stockholder in the railroad com- pany, every act had been done by the incorporators, stock- holders and managers required by law to acquire corporate rights and powers, and it will scarcely be contended that the railroad company up to that time could not have lawfully entered upon private property against the will of the owner for the purpose of making the necessary surveys and location of its road, and that it could not have procured by judicial sentence a condem- nation of private property for its right of way. It had become, in other words, a railroad corporation under the laws of the state, clothed with all the powers conferred by law upon such. This being so, all conditions precedent having been performed by the incorporators, it is simply out of all precedent for the appellant in a collateral proceeding like this, or in any other proceeding, to attempt to show that the corporation was a nullity, by show- ing that certain conditions subsequent had not been complied with. The existence of a corporation once formed, can only be called in question by a direct proceeding, and that, too, at the suit of the sovereign power—the state.

Nor are the breaches of conditions subsequent alleged by the appellant, such as a failure of the stockholders to pay up their subscription, the failure to hold elections to elect directors, and breaches of a similar character, sufficient grounds for the destruction of a corporate existence, even at the suit of the state, where the by-laws, and of course where the law, provides that the directors named in the charter shall serve until their successors are elected and qualified as provided by the laws of this state. *Mansf. Dig., sec. 5420; Comm. ex rel. Claghorn v. Cullen, 13 Penn. St., 133; Cahill v. Kalamazoo Mutual Ins. Co., 2 Douglass (Mich.), 124.* <span>2. Breaches of conditions subsequent.</span>

Moreover, the town of Searcy having dealt with the Searcy Branch Railroad Company as an ostensible corporation, whereby rights became vested, cannot be heard to plead its want of corporate character. *Oregon Ry. Co. v. Oregon Ry. & Nav. Co., 20 A. & E. Railroad Cases, 523.* Presumably to make the point that the railroad corporation had ceased to exist by abandonment, and consequently that the town of Searcy, the sole stockholder with paid up stock, was also the sole and exclusive owners of the railroad, the appellant's counsel contend, in argument, that her subscription to the capital stock of the railroad company, the issuance of her bonds and the levy and collection of taxes to redeem the same, were acts expressly authorized by an act of the general assembly approved July 23, 1868; admitting at the same time that laws providing for the carrying of such power into effect were wanting, unless the analogous laws applying to counties be called into requisition, which they say was done in this case. <span>3. Estoppel.</span>

It is difficult to see the point in this argument. Whether the town was expressly authorized to take stock or not is a question, it seems to us, that has little to do with the town's sole ownership of the road. At all events, the act approved July 23, 1868, was repealed by a subsequent act, once published in

the *Digest of Arkansas*, and more recently copied in *Gantt's Digest*, beginning at *Section 3194*, and including *Section 3202.*

**4. Railroads must have five stockholders.** The indisputable fact is, that there never was a time in Arkansas since the adoption of the general incorporation laws, when railroad corporate rights could be possessed and exercised by one sole owner. There must be at least five owners, or there is no franchise to own. Nor does it mend the matter to say, that a corporation stockholder in another corporation, is of itself composed of many individuals, for as a stockholder it is but one person.

**5. Sale by trustee to himself: Whether void or voidable.** The next question in order is, whether the sale to W. A. Yarnell and brother was void *per se*, because of his being one of the directors of the company until negotiations between himself and the other directors were already pending, and during which he resigned (the sole purpose of his resignation being to place himself in a position to make the purchase), or was it only voidable?

There is and there should be a distinction between the case of a sale to a sole trustee, and a case of a sale to several trustees. Even in the case of one trustee selling the property of his *cestui que trust* to himself, the rule seems to be, that such a sale is voidable, that is, void or not, according to the circumstances of the case.

Thus in *3 Waite's Actions, p. 468*, cited by the appellant's counsel in their brief, it is said: "But although a trustee cannot purchase of himself, he may, under special circumstances buy from the *cestui que trust* if the latter is *sui juris*."

If it be true that the town of Searcy, as the owner of a majority of the stock in the railroad company, advised, assented to, or afterwards by her acts ratified, the sale of the road to W. A. Yarnell, one of the directors of the company, and if the town of Searcy was at the time *sui juris*, could it be said that the sale was void under the rule quoted above? Again, in *Pickett v. School District No. 1, 25 Wis., 551*, also quoted by

appellant's counsel, it was held :   That the contracts of direc-
tors made with one of their number are *voidable* in equity;
meaning of course, that they are not absolutely void.

There may be isolated cases where sales of trust property
by a trustee to himself have been treated as void absolutely,
but the weight of authority is decidedly in support of the rule
by which such sales generally are treated as voidable only, es-
pecially in equity.

It is contended by appellant that she had no power to dis-  6. CORPORA-
pose of her corporation property, and for that reason the sale  TIONS: Power
to sell corporate property.
of her interest, whatever it was, to the Yarnells, was null and
void.

A municipal corporation may be the owner of two classes
of property.   One class includes all property essential to, or
even convenient for, the proper exercise of municipal functions
and corporate powers.   The other class includes all property
held for general convenience, pleasure or profit.   It is needless
to inquire into the extent of the rights and powers which a
municipal corporation has in and over property of the first
named of these classes.   It may well be admitted that such an
inquiry would involve grave doubts.   But the Searcy Branch
Railroad, and all its property and franchises, belonged to the
second class, and our inquiry is solely as to that.

In *Bailey et al. v. Mayor, etc., of New York, 3 Hill, 531,* it
was held that : " A municipal corporation, when in the exercise
of franchises and the prosecution of works for its emolument
or advantage, and in which the state in its sovereign capacity
has no interest, is answerable as a private corporation, although
such works may also be in the nature of ' great enterprises for the
public good,' and 'powers granted exclusively for public pur-
poses belonging to the corporation in its public, political or
municipal character.'   Powers granted for private advantages,
though the public may also derive benefit therefrom, are to be re-
garded as exercised by the municipality as a private corporation ;"

and "municipal corporations in their private character, as owners or occupiers of property, are regarded as individuals." We quote from the syllabus of the case, which seems to be a correct epitome of the opinion.

The same distinction is made, and the same rule announced in *Lloyd v. Mayor, etc., of New York, 5 N. Y. (1 Selden), 369.*

Again, if the power to dispose of her property was nowhere expressly granted to the town of Searcy, it is equally true that it was nowhere expressly withheld, and such disposal nowhere prohibited. The question, therefore, is merely a question of a bare want of power.

7. SAME:—
Estoppel: *Ultra vires.*

The contract of sale being otherwise fair and lawful, both parties having performed their respective parts, the plea of "*ultra vires*" cannot and ought not in equity and good conscience to avail anything. See *Hitchcock v. Galveston, 96 U. S., 341;* and *Union National Bank, v. Matthews, 98 U. S., 621.*

8. Power of stockholders to sell.

Again, it is contended, that the company, even by a vote or assent of stockholders, otherwise expressed, could not sell the road with the franchise. It is true that not even a majority of the stockholders in number or amount, or both, can sell the property of the company against the wishes of the minority, and thus defeat the object for which the corporation was

9. Power to sell franchise.

formed; and it may be true that the franchise may not be sold at all, and yet the directors, by unanimous vote of the stockholders, can sell all the other property of the corporation, under the theory that one may at all times sell his own, and thus the incorporators may denude themselves of all power and ability to exercise the right of the franchise; and they cannot avoid the consequences of their acts by setting up the inalienable character of the franchise right. The state alone has such an interest in that, as will enable her to sue for its recovery back to herself, not to the appellant. Again, the mere vehicle of conveyance of title to the road from the company to the Yarnells is objected to, as not being in conformity to the

laws of the state insuring perpetual succession in incorpora-
tions. This objection is not good, because the stockholders
having unanimously parted with all they could part with, there
is no one left to claim the succession, and consequently no one
left who is in a situation to be heard on such a plea. Besides,
the objection is a weak one, even in the minds of appellant's
counsel. Why not treat the deed in this case as an equitable
assignment of the stock, as suggested by appellant's counsel?
It is that if nothing more. Moreover, if there was no other
objection to the sale than the mere shape of the instrument by
which the title was sought to be transmitted from the company
to the Yarnells, this court, on proper application, in furtherance
of justice and right, would compel the transfer to be made in
proper form, under the rule that what should have been done
the court will compel to be done.

We have thus disposed of the merely legal objections to
the sale. Some of these would be unavailable as objections in
any case, and all of them are unavailable when relied on by
one occupying the relative position of the appellant in this
case. The facts of the case may be disposed of more briefly.

Granting for the sake of argument, that his fiduciary rela-
tion did not cease by reason of his resignation as one of the
directors of the company; and yet the evidence in the case
fails to sustain the charge that William A. Yarnell, while in
this trust relation, and by reason of the same, so managed, or
assisted in managing the affairs of the company, as to compel
a sale of the road to himself, and to his advantage.

All the testimony adduced tends to show that the wooden
tramway, in obedience to natural laws, at the end of four or
five years from its construction, was so rapidly going into total
decay, that early in the year 1877, the company, the town
council, the citizens of Searcy and all persons interested,
plainly saw that some disposition of the road must be made,
other than renting or leasing it as had been the practice. Un-

der the then existing laws, the town of Searcy, as a corporation, was powerless to render pecuniary aid or grant relief in any way. All seemed to regard a sale of the road as the only way out of the difficulty; the only remedy against the impending ruin. A sale was sought by various methods to be made, to all who might desire to purchase, and finally, when no one else would undertake it, the Yarnells made the purchase upon substantially the same terms as had been repeatedly offered to all others. The original object of the town was to secure connection with the Cairo & Fulton Railroad, for her citizens' profit and convenience; and in the prosecution of this object, and to gain an end so desirable, the town had expended about eighteen thousand dollars. In the course of time the keeping up of the road began to promise a greater outlay than the town was able to make; her management and control of it, always awkward, inconvenient and embarrassing, had now become impracticable; the usual fears of monopolizing demands on the part of the Cairo & Fulton road began to seize the minds of the people, begetting the idea of extending the tap road to West Point, the head of steamboat navigation on Little Red river, so as to destroy or prevent the apprehended monopoly. A sale of the road was not only desired but was inevitable. To carry out the original design, keep up a connection between the town and the Cairo & Fulton road, to substitute steam for horse-power, and to extend the connection to West Point in answer to the demand of the citizens, and by the payment of the sum of five hundred dollars in addition, the Yarnells became the purchasers of the road; and the evidence goes to show, literally complied with their obligations, and in doing so, expended about the sum of thirty thousand dollars. This certainly was not such a want of consideration, such an inadequate consideration, as will cast a shadow of suspicion upon their dealings; certainly not such as would invalidate the sale.

Finally, the town of Searcy—having authorized and made the sale through her acknowledged agents; having stood by

and seen, without warning or objection, the appellees expend their time, labor and means in carrying out their part of the contract, and having waited for a period of nearly five years in apparent acquiescence; when at length the affairs of the road, perhaps under the judicious management of her enterprising citizens (the appellees) had assumed the airs of thrift and prosperity—instituted this action to recover back from them that which she had sold to them, and for which they had paid her such a price. It is not the odious plea of the statute of limitations that is interposed against the appellant's claim. It is a plea of estoppel—a plea that has for its object the assertion of the principle that one is not to be permitted to profit by his own wrong, or to possess himself as his own of the proceeds of another's labor, which he has caused him to expend. The appellant waited until she was no longer able to put the appellees in *statu quo*, if indeed she ever was; and worse still, she does not even offer to do so. There is not equity in a bill which seeks and does not offer to do equity; nor is there equity in the case of a complainant who deliberately waits until he is no longer able to do equity, and then brings his suit demanding equity. Such is the nature of the case under consideration, as it appears to us.

The decree of the White county circuit court in chancery is therefore affirmed at the costs of the appellant.