BROWN *v.* WYANDOTTE & SOUTHEASTERN RAILWAY COMPANY.

Opinion delivered April 21, 1900.

1. CHANCELLOR'S FINDING—CONCLUSIVENESS.—Where there is not a clear preponderance of the evidence against a chancellor's finding, it will not be set aside on appeal as contrary to the evidence. (Page 139.)

2. CONDEMNATION—ULTERIOR MOTIVES.—If land sought to be condemned is needed for legitimate railroad purposes, the motives which influenced the railroad managers in undertaking the work will not take from it its public character. (Page 140.)

3. RAILROAD CORPORATION—CONDITION SUBSEQUENT—FORFEITURE.—Sand. & H. Dig., § 6149, providing that the articles of association of a railroad company "shall be null and void unless there shall be filed in the office of the secretary of state a preliminary survey of the road and five per cent. on the original amount of stock subscribed thereto shall have been paid in cash to the directors named in such articles within two years after such articles of association shall have been filed," was not intended to work a forfeiture *ipso facto* upon default of the company, but to declare a ground of forfeiture available at the state's election, and its failure to comply with the statute could not be availed of as a defense in a proceeding by a railroad company to condemn land. (Page 140.)

4. REDUCTION OF STOCK—INFORMALITY.—An informality in the vote taken to reduce the capital stock of a railroad corporation would not affect the corporate existence of the company. (Page 144.)

5. EMINENT DOMAIN—DAMAGES.—Where parties engaged in the lumber business agreed that a railroad used for hauling logs should remain where located for five years, and, if the party of the first part wished to discontinue or remove said road at any time thereafter, the party of the second part should have the preferred privilege of buying the same by paying the market price for old iron, a railroad company which, with the consent of the party of the first part, undertakes to condemn the log road for its right of way will be liable to the party of the second part for the present value of the road without the iron. (Page 144.)

Appeal from Garland Chancery Court.

LELAND LEATHERMAN, Judge.

### STATEMENT BY THE COURT.

This suit was brought by the Wyandotte & Southeastern Railway Company to condemn a right of way over a logging road owned mainly by J. H. Hamlin & Son, in which Joseph Brown also had an interest. Hamlin & Son and Joseph Brown were made defendants, and also Mrs. Brown, the wife of Joseph Brown. Hamlin & Son answered, and asked that their rights under the contract with Brown be protected.

Brown answered, denying the corporate existence of the Wyandotte & Southeastern Railway Company; denying that it had filed the preliminary survey required by section 5169 of Sandels & Hill's Digest, or that five per cent. of the original stock had been actually paid in cash; stating that he had a sawmill plant and property at Gifford and in its vicinity worth $500,000, and 17,500 acres of land, accessible over this logging road, worth $25 per acre for timber, and, if deprived of the logging road, his property would be destroyed; etc.; and claiming the right to buy the logging road, under his contract with Hamlin & Son, at the price of the old iron on the road. He alleged that the suit was a scheme to transfer his interest in the property to the Malvern Lumber Company; that the incorporation of the plaintiff was not in good faith, but to promote private interests only; and that there was no public necessity for the road. He made his answer a cross complaint against Hamlin & Son, and asked that the cause be transferred to equity, which, on his motion, by consent, was transferred to equity. Brown filed an amendment to his answer, stating that on June 23, 1896, Hamlin & Son had given him notice that they would no longer op-

erate the logging road jointly with him, and that on July 16, 1896, they notified him to stop using it, and alleged that by the terms of the contract Hamlin & Son were bound to keep the logging road in a condition to permit the safe running of cars at the rate of twenty miles an hour, which they had failed and neglected to do, to his damage in the sum of $7,000; that Hamlin & Son tore up two miles of road, running through sections 32 and 33, in township 4 south, 15 west, called the "northeast spur," thereby damaging him $2,000. He claimed damages for terminal facilities, worth $50 per month, according to his estimate.

Plaintiff answered; denied the incorporation was fraudulent; charged Brown with selfish motive in his opposition, etc. Brown filed an amendment to his answer, alleging that the plaintiff had forfeited its corporate existence by failing to construct and put in operation five miles of its railroad within the period prescribed by the statute.

The chancellor sustained the incorporation as valid; held that Brown, under the contract with Hamlin & Son, had the right to buy the road at the value of the old iron delivered at Gifford; sustained the right of condemnation of the logging road by the Wyandotte & Southeastern Railway Company; and found the value of the road to be $5,040 without the iron, or that Brown was damaged in this amount by the condemnation of the property, and in the sum of $75 dollars for injury to lands adjoining, and that Mrs. Margaret Brown was damaged $35 on account of land of hers taken by said company,— and decreed accordingly. The court also found that the road had been kept in good repair by Hamlin & Son, and that Brown was not entitled to recover on account of taking up the "spur track," nor for terminal facilities at Gifford, for which Brown claimed compensation, nor for moneys expended by Brown in repairing the logging road, nor for failure of Hamlin & Son to keep said logging road in good condition; and that he was not entitled to claim any set-off by reason of such claim for damages; and dismissed his cross-complaint against Hamlin & Son, except as provided for in the conract between Hamlin & Son and Brown, and that the railway company, Hamlin & Son, and Joseph

Brown each pay one-third of the costs, to all of which Joseph Brown and Margaret Brown excepted at the time, and have appealed to this court.    Hamlin & Son have taken a cross-appeal.

*Wood & Henderson,* for appellants, Brown *et al.*

The railway company had neither authority nor right to condemn the logging road, because it has failed to comply with the requirements of the law governing the formation of corporations in this state.    Sand. & H. Dig,, §§ 6148, 6149, 6152. The evidence shows that the railway company was fraudulently incorporated: also, the filing of the profile map required by section 6170 of Sandels & Hill's Digest was a condition precedent to the right to construct any part of the road, or to institute condemnation proceedings.    To the point that a railway company, in order to have the right to exercise the power of eminent domain, must comply with the statute granting such right, see:—7 Enc. Pl. & Pr. 468–9, 536, 542 and notes; 10 Am. & Eng. Enc. Law, 1053–4, 1057; 58 Fed. 751, 756; Lewis, Em. Dom. § 600; 37 Am. & Eng. R. Cas. 430; 36 *id.* 234; 44 *id.* 193; *ib.* 43; 57 *id.* 536; 57 *id.* 612; 19 Wis. 459; 40 Wis. 157; 10 Am. & Eng. R. Cas. 23; 120 Mass. 352; 55 Pa. St. 16; 23 Conn. 189; 73 Am. Dec. 17.    The company had no power of condemnation for the additional reason that it had failed to build any part of its road within the limit fixed by the act of March 31, 1885 (Acts 1885, p. 170). The forfeiture of the company's charter for non-compliance with this act can be set up by the owner of property which the company is seeking to condemn.    72 N. Y. 245; 106 Mo. 566; 30 Me. 498.    The evidence shows that the company has no real right to take Brown's property; and a court of equity has power to grant him relief by injunction.    7 Enc. Pl. & Pr. 708; 62 Am. Dec. 372; 32 Atl. 680; *id.* 381; 32 *id.* 19; 18 *id.* 431; 9 *id.* 754; 3 Pom. Eq. § 1345; 6 Thomps. Corp. § 7772; 4 L. R. A. 275; 31 N. J. Eq. 475; 75 Ill. 113; 68 Ia. 164.    The court will, under some circumstances, control the location of a railroad.    7 Am. Rep. 385; Rand, Em. Dom 167. Under his contract with Hamlin & Co., Brown was entitled to the rails at their market price elsewhere, with necessary freight

subtracted. 13 L. R. A. 770; 23 Wall. 471; 1 Benj. Sales, 102, 978, 1120–1; 69 N. Y. 384; 47 N. Y. 167. Brown should also be allowed damages to compensate him for the loss to his other property, by the removal of the road. 45 Ark. 252; 44 Ark. 258; 39 Ark. 107; 42 Ark. 528; 54 Ark. 140; 35 Ark. 622; 10 Am. & Eng. Enc. Law, 1169, 1173, 1174, 1175.

*Hill & Auten*, and *Rose, Hemingway & Rose*, for appellees, and cross appellants.

Under the decision in 43 Ark. 112, cited by appellants, there is nothing in the evidence that points to fraud on the part of the incorporators of the railway company. "The making of a public improvement cannot be enjoined because it is unnecessary, or is being made to further private ends." Lewis, Em. Dom. § 646; 57 Ark. 359, 364. On condemnation proceedings, valid corporate existence is presumed from the face of a valid charter. Mills, Em. Dom. 82. The failure of a corporation to fulfill what the law requires of it can be urged, as a ground of forfeiture of its charter, by the state alone. In like manner it has been held that only the state could assert a a forfeiture of a donation of public lands. 46 Ark. 97; 47 Ia. 200. So it is with railroad corporations which have failed to construct their road within the time limit prescribed by law. 2 Wall. 44, 63; 5 *id.* 267; 92 U. S. 50, 66; 106 U. S. 360, 368; 115 *id.* 470, 473; 103 *id.* 739, 744. The word "void," as applied in the statute to charters of companies failing to comply with the requirements of the law, means *voidable at the instance of the state.* Endl. Int. Stat. § 269. These requirements were mere conditions subsequent, and must have been acted on by the state, to effect a forfeiture. 5 Ark. 604; 18 Ark. 338; 20 Ark. 204. They cannot be raised as grounds for attack upon the corporate existence in a collateral proceeding by a private party. 20 Ark. 450; 31 Ark. 476; 43 Ark. 120; 47 Ark. 269; 167 U. S. 646; 20 Am. & Eng. R. Cas. 17; 79 Mo. 632; 10 N. E. 349; 57 N. Y. 401; 70 N. Y. 327; 2 Mor. Corp. §§ 1015, 1023; 10 Am. & Eng. R. Cas. 306; S. C. 105 Ill. 73; 7 Cold. 420; 13 La. 497; 32 Barb. 358; Pierce, Rys. 11, 12; 14 Am. & Eng. R. Cas. 43; 33 *id.* 84; 4 Am. & Eng.

Corp. Cas. 53; S. C. 89 Md. 410. Applying the maxim, *Id certum est quod certum reddi potest*, the preliminary survey was sufficient. 3 Ark. 18; 2 Dev. Deeds, § 1020. That the survey was sufficient, see: 1 Zab. 448, 450; 9 Kas. 137. The required 5 per cent of the capital stock was paid—invested in rails. The fact that these rails were bought of one of the directors is no objection. 59 Ark. 562. The reduction of capital stock was authorized and legal. Acts 1895, p. 19. There being no fixed period for the duration of the contract between Brown and Hamlin & Son, it was terminable at will. 3 Kent's Comm. 53; 2 Bates, Part. 571; Laws. Bail. § 29; 13 Am. & Eng. Enc. Law, 977; Wood, L. & Ten. §§ 14, 15. There can be no such thing as a *constructive removal* in this case. A right of way is an easment—an interest in land. 10 Mass. 188; 12 Allen, 461; 101 Mass. 68; 113 *id.* 59. There was no legal abandonment. 2 Wash. R. Prop. (4 Ed.) 370. The measure of Brown's damages is the value of his land that was taken, together with incidental damages to his other lands. 39 Ark. 168; 47 Ark. 527; 55 Ark. 333; 57 Ark. 207; 53 Ark. 434. Brown should be charged for the rails, the market price, plus freight to Gifford. 5 Am. & Eng. Enc. Law, 31. 14 *id.* 467; 23 Wall. 471. Brown is estopped, by his acquiescence in the change of the northeast spur, from claiming damages for its removal. 51 Ark. 492; 18 Ark. 143; 24 *id.* 373; 38 *id.* 572; 37 *id.* 48; 33 *id.* 465. Brown has no claim for rent. 33 Ark. 215; 47 *id.* 239. That the forming of a corporation to operate and extend the road was not an abandonment of the original franchise see: 39 Pac. 628.

HUGHES, J., (after stating the facts.) The counsel for the appellant Brown insist in their brief that there were not one thousand dollars per mile subscribed as stock in the railroad before the articles of incorporation were filed, and that this, being a condition precedent to the legal existence of the corporation, is fatal, and that the Wyandotte & Southeastern Railway Company never existed as a legal corporation, and therefore had no power to exercise the right of eminent domain. We understand this to be the gist of the argument on this point. The chancellor found that one thousand dollars

per mile had been subscribed as required by law before the articles of incorporation were filed and certificate issued. We are unable to see that there is a clear preponderance of evidence against the chancellor's finding, as this question does not seem to have been raised in the pleadings below, and therefore should not be considered here.

It is contended that the incorporation of the Wyandotte & Southeastern Railway Company was not in good faith, that there was no intention to corporate the road as a railroad, that its purpurpose is to take the logging road from Brown, that the region through which the road is projected to run is wet, poor and thinly populated. We do not think that this contention is so clearly sustained as to warrant this court in saying that the chancellor's finding is clearly against the preponderance of the evidence. "It should be a very clear and palpable fraud which would justify the courts in stopping this work at once, and perhaps forever." *Niemeyer & Darragh* v. *Little Rock Junction Railway*, 43 Ark. 112. It is said in *Railway* v. *Petty*, 57 Ark. 359, 364, "If the land is needed for legitimate railroad purposes, the motives which influenced the railroad managers in undertaking the work will not take from it its public character." That it will injure one and benefit another is no argument against the right of condemnation, which is in the public interest. "The making of a public improvement cannot be enjoined because it is unnecessary, or is being made to further private interests." Lewis on Eminent Domain, § 646.

The counsel for appellant in their brief say that "the form of the articles of association filed in the office of the secretary of state * * * show on their face a substantial compliance with said section 6148, but when the pretended incorporators undertook to meet the requirements of section 6149 they fell short." Section 6149 provides that "such articles of association shall be null and void, unless there shall be filed in the office of the secretary of state a preliminary survey of the road and five per cent. on the amount of the original stock subscribed thereto shall have been actually and in good faith paid in cash to the directors named in such articles within two years after said articles of association have been filed," etc.

Now, it is apparent that this is a condition subsequent, and that the failure to comply with it will be only a ground of forfeiture, which will expose the corporation to be proceeded against for a forfeiture, and does not, *ipso facto*, amount to a forfeiture which may be taken advantage of in a collateral proceeding, as in a proceeding to condemn, unless the words "shall be null and void" constitute a self-executing provision. It is the doctrine of the Arkansas supreme court decisions that "the existence of a corporation, once formed, can be questioned only by a direct proceeding, and that at the suit of the state." *Town of Searcy* v. *Yarnell*, 47 Ark. 269; *Niemeyer & Darragh* v. *L. R. Junction Ry.*, 43 Ark. 120; *Mississippi, O. & R. R. Rd. Co.* v. *Cross*, 20 Ark. 450; *Hammett* v. *Little Rock & N. Rd. Co.*, 20 Ark. 204. Forfeiture can be claimed only by the government, unless the statute expressly provides for the forfeiture of a charter at the suit of an individual, and, though grounds for forfeiture may exist, they cannot be shown by individuals in collateral proceedings. 3 Wood on Railroads, § 497. But see Commentaries on the Law of Corporations by Thompson (Vol. 5, §§ 6586 and 6587), in the latter of which he says: "The sound doctrine is that, where a statute creating a corporation declares that, unless the corporation performs certain acts within a prescribed time, its corporate existence and powers shall cease, or its powers and franchises shall terminate, the statute executes itself; so that, if the prescribed acts are not done within the prescribed time, the corporation, *ipso facto*, ceases to exist, without the necessity of any further action by the state, either by a legislative declaration of forfeiture, or by a judgment of forfeiture in a judicial proceeding. In such a case, whether the corporation has lost its existence is a fact *in pais*, which may be ascertained in any judicial proceeding, whether the question arises directly ɩ collaterally, whenever its ascertainment becomes necessary for the protection of rights or the redress of wrongs." In "the regrettable conflict of judicial opinion" on this question, it is quite reasonable to believe that the doctrine of the section 6587 is the sound doctrine. Yet this by no means solves the question we have in this case, for the language of

the section of our statute under consideration is not like nor of the same import as the language quoted above.

Section 6149 of Sandel's & Hill's Digest is as follows: "Such articles of association shall be null and void, unless there shall be filed in the office of the secretary of state a preliminary survey of the road, and five per cent. on the amount of the original stock subscribed thereto shall have been actually and in good faith paid in cash to the directors named in such articles within two years after said articles of association have been filed." This provision of the statute is not self-executing, and declares only a ground of forfeiture, or, in other words, exposes the corporation to proceedings by the state to declare a forfeiture, in the event of non-compliance with the requirements of the statute, provided the state sees fit to proceed for a forfeiture on account of failure to comply with the statute. It has been held that "if the charter of a corporation provides that the corporation shall cease to exist if a certain thing is not done in a certain time, the question whether the corporation has ceased to exist can be judicially determined only in a suit in which the commonwealth is a party." *Briggs v. Cape Cod Ship Canal Co.*, 137 Mass. 71.

"Unless the statute expressly provides for the forfeiture of a charter at the suit of an individual, only the government can assert the right to have it forfeited; and the mere circumstance that the corporation has done acts which are a good ground for a forfeiture cannot be shown by individuals in collateral proceedings, because the state may waive the forfeiture, or enforce it, as it pleases; and, until a forfeiture has been declared, it is not deprived of any of its corporate powers or functions,   *   *   *   nor does the fact that a cause of forfeiture exists work a forfeiture or operate as a defense to an action against it; and this has been held to be so, although there is a provision in the charter or general law providing that if the corporation shall do, or omit to do, a certain act, its charter shall, after a certain number of days, be, *ipso facto*, forfeited, and the period so limited has elapsed. A forfeiture can only be declared by a direct judicial proceeding, and the question whether the company has done or omitted acts which

amount to a forfeiture cannot be inquired into collaterally." 3 Wood on Railroads, § 497 and cases cited; *Miss., O. & R. R. Rd. Co.* v. *Cross*, 20 Ark. 443; *Hammett* v. *L. R. &. N. Rd. Co.*, 20 Ark. 204.

*In the matter of N. Y. & Long Island Bridge Co.*, 148 N. Y. 540, it is said (in the syllabus): "The question whether a forfeiture clause in an act of incorporation is or is not self-executing depends wholly upon the language employed by the legislature. The legislature has undoubted power to provide in an act of incorporation that corporate existence shall cease by the mere failure of the corporation to perform certain acts imposed by its charter. It requires strong and unmistakable language to authorize the courts to hold that the legislature intended that a forfeiture of corporate existence should be effected without judicial proceedings on the intervention of the attorney-general. The words 'all rights and privileges granted hereby shall be null and void' do not render a forfeiture clause in a charter self-executing; but the meaning of 'null and void' in such a connection is that the corporate existence shall be voidable, i. e., that in case of default the corporation may be dissolved through appropriate legal proceedings by the attorney-general."

We hold, under the authorities above cited, that the provisions of section 6149 of our Digest (Sandels & Hill's, p. 1359) that "such articles of association shall be null and void unless there shall be filed in the office of secretary of state a preliminary survey of the road and five per cent. on the original amount of stock subscribed thereto shall have been actually and in good faith paid in cash to the directors named in such articles within two years after said articles of association have been filed," etc., was not intended by the legislature to work a forfeiture, *ipso facto*, upon default of the company, but was intended only to declare a ground of forfeiture, upon default of the company, which might, at the election of the state, or not, be taken advantage of in a direct judicial proceeding to have the charter of the corporation declared forfeited for failure to comply with the statute, and that such failure could not be availed of as a defense in this action. The failure of the cor-

poration, under the authorities cited, to build five miles of its road within two years did not forfeit its charter, nor annul its powers of association.    This is a condition subsequent.

We think it was competent for the company to reduce its capital stock as it did, under the act of February 12, 1895 (Acts 1895, page 19), which provides: "Any corporation organized under the laws of this state may reduce its capital stock." If it was not done by proper vote, we cannot see how this would affect the corporate existence of the corporation.

The remaining question of importance to be determined is what are the rights of the parties under the contract between them? Is Brown, the appellant, entitled to the right to buy the logging road at the price of the iron delivered at Gifford; and, if so, what are his damages by reason of the condemnation which the Wyandotte & Southeastern Railway Company has a right to make of the logging road? The solution of the question, has Brown the right under the contract to buy the road on the terms indicated? depends upon the construction of the language of the contract between Hamlin & Son and Joseph Brown, which is as follows: "It is further agreed that the above-mentioned railroad shall remain where located for a period of five years from the date of this agreement, or longer, if the party of the first part so desire; but if the party of the first part [Hamlin & Son] wishes to discontinue and remove said railroad at any time after the period of five years, the party of the second part [Brown] shall have the preferred privilege of buying the same, or any portion thereof, by paying therefor the then market price of such old rails, splices, bolts and nuts, based on the delivery of same at Gifford, Ark., and their actual weight shall be determined as accurately as can be reasonably done, and the said party of the second part [Brown] shall then become the sole owner of that portion of railroad, and its then located right of way, but not south of boundary line of five (5) south, range fifteen (15) west, nor is this meant to convey any right of way over any lands not owned by said party of the first part." It is contended with much force and ingenuity that the contract means that, before Brown could have the right to purchase,

there must be a discontinuance and removal of the logging road shown, and that, as the fact is that the railway does not intend to remove it, but to build its road on the same route, there is therefore no removal, within the meaning of the contract, which would give Brown the right to purchase. But we cannot put this construction upon the contract. Brown doubtless sought by this contract to prevent being cut off from access over this road to his timber lands, many of which were situate along the line of this logging road. When the logging road was discontinued, and the iron was to be removed to convert into a standard gauge road, it was as much removed as a logging road, so far as Brown's interest was concerned, as if the rails and cross ties, etc., had been actually removed. It deprived Brown of the use of the logging road, over which to haul his timber. This is what this provision of the contract was intended to prevent, and in our judgment this is the reasonable and inevitable proper understanding of the meaning of the parties to the contract. There is no contention that Brown did not give proper notice of his election to purchase the road on the terms set out in the contract. His right to purchase it therefore seems clear to us.

What was the road worth without the iron? Mr. Hartman, a civil engineer and railroad man, examined and measured it, and made an estimate, showing the length to be $9^3/_5$ miles; that the cost per mile, according to his estimate, was $1,200, which would give an aggregate for the whole of $11,520, with estimated cost of bridge added, $1,000, which would aggregate $12,520. Buchanan, another civil engineer, made measurement and estimation of the costs of the road at $8,026. Putting the two estimates together, we have the total of $20,546. The mean cost (one-half of the above amount) will give $10,273. From this we deduct Hartman's estimate of amount necessary to restore road to its original cost price $3,000, which leaves the sum of $7,273 as the total present value. To which add value of Brown's right of way $75, making $7,348, present value of road and right of way, exclusive of iron. This we have concluded to be the value of the road without the iron,

and the amount Brown is entitled to recover.  Mrs. Brown is entitled to a decree for $35.

The testimony tends to show that the road was kept in good condition for a logging road, and Brown has made no proof of damages sustained by him by reason of the road not being kept in good condition.  He does contend that it was not kept in such condition that cars could be safely run over it at the rate of twenty miles an hour, and contends that Hamlin & Son were bound by the contract to keep it in such condition.  But the contract shows that this construction cannot be maintained.  The contract is this:  "Provided that, if neither party to this agreement purchase the railroad belonging to the Hearne Lumber Company, then the party of the first part [Hamlin & Son] shall have the privilege of furnishing T iron or steel rails of not less than thirty pounds weight per yard, with spikes, splices, bolts and nuts, to complete the road from the east end of the line owned by the party of the second part [Brown] at Wyandotte and Gifford switch to as far as said road may be constructed;  *  *  *  road to be well constructed, and safe to operate a locomotive and train of cars at a speed of twenty (20) miles per hour."  This shows that the provision for twenty miles an hour relates only to a road Hamlin & Son might build in the event neither party bought the road of the Hearne Lumber Company, but which was never built; they having bought the road of the Hearne Lumber Company.  The chancellor was correct in denying Brown damages on this account.

We find no error in the decree denying Brown's claim for damages for the removal by Hamlin & Son of the Northeast spur.  We think the circumstances in proof show that Brown consented to its removal.  Besides, it is not certain that they did not have the right under their contract with Brown to remove it.  We deem it unnecessary to make a statement of the facts relating to its removal here.

It appears to us that there is no error in refusing to allow Brown damages for terminal facilities at Gifford, for it seems he did not intend or expect to charge for them at the time they were allowed Hamlin & Son.  Having granted the

privilege of terminal facilities without intention of charging for them, he could not afterwards change his mind and charge for them.   *Osier* v. *Hobbs,* 33 Ark. 215; *Cantrell* v. *Clark,* 47 Ark. 239.

The judgment and decree of the chancellor is affirmed, except as to the amount of damages allowed Brown for condemnation of the logging road, as to which it is reversed, with directions to enter a decree below in accordance with this opinion.

BATTLE, J., concurs, but does not agree as to the reasons given for the construction of that part of the contract which provides what shall be done when the road is removed or discontinued.

RIDDICK, J., (dissenting.)   While I agree with most of the propositions of law stated in the opinion of my associates in this case, I am not able to concur in the meaning given by them to the contract between Hamlin and Brown, or in their finding in reference to the removal of the road.   To recapitulate the facts briefly, Brown and Hamlin were both engaged in the business of sawing and manufacturing lumber.   Hamlin purchased of the Hearne Lumber Company a logging railroad running from Wyandotte, on the St. Louis, Iron Mountain & Southern Railroad, across lands owned in part by Brown and in part by Hamlin.   Brown had a logging railroad of his own, connecting with or crossing this road purchased by Hamlin; and he and Hamlin entered into a contract by which each gave to the other the right of way over his lands, and the right to push cars and haul logs over the road of the other.   The contract also contains the following provision in reference to the railroad which had been or was about to be purchased by Hamlin, who is designated in the contract as party of the first part: "It is further agreed that the above-mentioned railroad shall remain where located for a period of five years from date of this agreement, or longer if the party of the first part so desire; but if the party of the first part wishes to discontinue and remove said railroad at any time after the period of five years, the party of the second part shall have the preferred privilege of buying

the same, or any portion thereof, by paying therefor the then market price for such old rails, splices, bolts and nuts, based on the delivery of same at Gifford, Ark." Now this contract, which it is unnecessary to read in whole, may be in some respects a little vague and uncertain, but the clause above quoted very clearly sets forth the conditions or circumstances under which Brown had the option of purchasing Hamlin's road. He had this only in the event that Hamlin should wish to "discontinue and remove" the railroad. In that event Brown had the option to purchase by paying the price of the iron, which is about all of a railroad that could be removed. The Wyandotte & Southeastern Railway Company now seeks to condemn this logging road for its right of way, and Brown contends, because Hamlin is interested in that company and consents to the condemnation, that Hamlin has removed the logging road or intends to remove it, and that therefore he has the right to purchase it under his contract with Hamlin.

But how can we say that there has been a removal of this road, when it has remained and is now in the same place as it was when this contract was made? To say that there has been a removal as to Hamlin only, in other words, a constructive removal, is to announce something that cannot be true. A railroad cannot at one and the same time remain stationary and be removed. To say so is just as absurd as to speak of a train running forty miles an hour while standing still. Moreover, the contract, the circumstances under which it was made, and the language used show that the parties contemplated that Brown should only have the option to purchase in the event that Hamlin desired to discontinue and actually remove the road. If Hamlin intended to abandon and remove his road, it would then only be worth to him the value of the iron, for that is all of the road that it would pay to remove. And this explains why the value in the event of a removal was fixed at the price of the iron. It is hardly conceivable that Hamlin would have agreed to sell his right of way, roadbed, ties and rails at the price of the rails only, unless he intended to abandon his roadbed and right of way. But in this case he does not wish to either abandon or remove his road, and yet the

court holds that he has removed or intends to remove it, and in assessing the damages for the right of way treats Brown as the owner of the entire road except the rails.

The court, as a reason for this judgment, says that Brown by this contract intended to prevent Hamlin from discontinuing the road as a logging road, but the contract does not support this view. It states that Brown shall only have the right to purchase in the event Hamlin desires to discontinue and remove his road. It may be that it would have been prudent for Brown to have written his contract differently. But it takes two to make a contract, and, if he had done so, it is possible that Hamlin would not have agreed to it. In any event, the contract as written only permits Brown to purchase when Hamlin concludes to remove the road, and I think to construe it as the court has done is to make a new contract much more favorable to Brown than the one agreeed to by Hamlin.

If the Wyandotte & Southeastern Railway Company is lawfully incorporated, and had the right to condemn this logging road purchased by Hamlin from the Hearne Lumber Company, as the court declares in its opinion, then I think the damages assessed for the taking of such road should be the same as if Hamlin had no connection with the road seeking to condemn. If this is a fraudulent scheme on the part of Hamlin, then no condemnation should be permitted; but if the corporation has the right to condemn, as the court holds, and with which ruling I concur, then the damages for the taking of the logging road should be assessed just as if neither Brown or Hamlin had any connection with the railroad company asking the condemnation.

If the Iron Mountain or some other railroad in which neither Brown or Hamlin was interested was seeking to condemn this road, it would be unjust to allow Brown damages for that portion of the road owned by Hamlin, and in this case I think it is equally wrong and unjust to allow him such damages. Whatever right or interest Brown had in this road should be fully paid for, and one of his rights, which should be considered in assessing his damages, is the right given him by

the contract to purchase in the event Hamlin removed the road. But there has been no removal of the road, and he has no right to claim pay for Hamlin's interest in the road because Hamlin consents to the condemnation and he opposes it.

Taking the basis on which the court assessed the damages, I think the amount allowed is moderate; but, for the reasons stated, I think the assessment is based on an erroneous view of Brown's interest in the road condemned, and I therefore dissent.