Barrett, J.
The questions to be decided in this case-are, whether the acts complained of are corporate acts; and if so, whether such corporate acts are grounds of forfeiture within section 1798 of the Code of Civil Procedure.* - The People rest their case primarily upon the second and fifth. *183 subdivisions of this section, claiming under the second subdivision that the defendant has “ become liable to be-dissolved by the abuse of its powers,” and under the fifth that it has exercised privileges or franchises not conferred upon it by law.
The act compiained of in this connection, is the defendant’s participation.in a combination between the owners of certain sugar refineries. The combination comprises all the sugar refineries in this State, and with a few exceptions in> the United States. This vast combination is denounced by the people as a public menace, as preventive of competition, and as tending to control prices and ci’eate a monopoly. It is defended by the corporation as the mere individual act of its stockholders, in no wise binding upon it, and at all events as a harmless association constituting nothing more serious than an unusually large partnership; in other words, a lawful blending of individual interests in a joint arrangement for mutual protection and benefit.
The first question then to be considered is, whether the corporation, as such, has entered into this combination ; for if it has not, clearly it cannot be deprived of its franchises because of independent and several acts, however illegal, of its stockholders. To a proper appreciation and solution of this question, the precise facts must be gleaned, and the-foundation of the transaction minutely analyzed. Such analysis will also and necessarily throw a clear light upon, the purposes of the project, and thus aid in the solution of the second question—namely, whether the combination is= the innocent association claimed by the defendant, or the-unlawful one charged by the plaintiff.
Let us then consider the foundation of the combination. It rests upon a written agreement which has been styled the “ trust deed.” At the time this deed was prepared, sugar refineries in this State and country were variously-organized. Some were simple partnerships; others corporations. Evidently the first step contemplated by the author-of the scheme, was harmony in the fundamental business^ *184 -basis of each refinery. The combination never could have >been successfully created upon the basis of a special or quasi-partnership arrangement between partnerships and corporations. It was necessary, therefore, either to turn the corporations into partnerships, or the partnerships into •corporations. It did not require the .astuté mind that .prepared this most original instrument to perceive that an aggregation of partnerships, with the dangers resulting •from death and the exercise of individual power, would never effect safe and permanent cohesion. Accordingly we .find, as one-of the first provisions in the deed and as the basis of the so-called trust structure, a condition in sub•stance that the partnerships shall all be turned into corporations. This in fact was done; and thus several of these corporations were organized for the express purpose of creating the very shares of capital stock through which the combination was to be formed. Partners took on corporate .garb, became shareholders, and as such fitted themselves to enter the combination within the terms of the deed. Having thus provided for uniformity of corporate existence, the deed specifies what is to be done by each of the corporations—formed or to be formed. The corporations already formed agree for themselves, and the partnerships agree for those corporations which they are to form, that all the shares of the capital stock of all the corporations shall be transferred to a board consisting of eleven persons (named in the deed) as trustees, to be held by them and their suecessors, strictly as joint tenants, subject to the purposes set forth in 'the deed. These purposes are declared to be :
1. To promote economy of administration and to reduce the cost of refining, thus enabling the price of sugar to be kept as low as is consistent with reasonable profit.
2. To give to each refinery the benefit of all appliances ■and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar.
3. To furnish protection against unlawful combinations •of labor.
*185 4. To protect against inducements to,lower the standard ■of refined sugars.
5. Generally to promote the interests of the parties hereto in all lawful and suitable ways.
The board is authorized to make by-laws, to appoint from its members a president, vice-president, treasurer, and committees ; and to prescribe their duties and powers. The board is thus clothed with a power co-extensive with the specified objects of the agreement, as applied to the business' •of each refinery ; and it may confer the executive working •of that power upon a president or vice-president. Having thus formed the trust, named the trustees, and specified their powers, the deed proceeds to indicate the persons for whom the trust is created and the duties of the trustees with regard to such persons. The cestuis gue trustent are, of course, the entire body of stockholders of the aggregated corpor.ations. It will be observed that these stockholders do not sell a single share of their stock. Tet they transfer the entire block to eleven gentlemen, who are thereafter to stand in their shoes. They would, naturally, look for some .acknowledgment from their trustees of the receipt of their shares and of the obligations which the trust imposes. The deed proceeds to furnish this in the shape of what are termed trust certificates. These certificates are not to exceed $50,000,000, and are to be divided in 500,000 shares, each of $100. They are to be divided by the eleven trustees among the several refineries, in due proportion to the value of their respective plants; and the refineries are then to subdivide the blocks of certificates, so assigned to them, among the •icestuis gue trustent in proportion to the stock of the corporation which each cestui gue trust held prior to the transfer to the trust board. The form of the trust certificate is preeisvly like the certificate of stock in a corporation. The •eleven trustees are not named, but are styled “ The Sugar Refineries’ Company,” and each certificate specifies that it is issued under and subject to the provisions of the trust deed. The usual blank form of assignment and power of attorney *186 is endorsed upon this certificate, with an addendum to the-effect that the assignee, by accepting the transfer, assents to the terms of the trust deed.
To avoid confusion of thought, and to distinguish clearly between the eleven trustees constituted by the deed and the-trustees of the various corporations, we will hereafter speak of the former as the “trust board” or “ the trustees,” and of the latter as “the directors.”
Upon the acceptance of the trust certificate the original corporate shareholder ceases to hold any further relations with his particular corporation, and thenceforward he is treated as a shareholder in the trust board. He can no longer receive a dividend from his particular corporation, nor indeed can the latter ever again declare a dividend. Each corporation is thereafter bound by a special provision in the' deed to pay over the profits arising from its business to the trust board. Ho discretion on that head is left in the directors of the various corporations. They cannot use any part of such profits for betterments or improved machinery, or increased capacity—certainly not without the consent of the trust board—but must pay over all the profits directly to the trustees. Xor can even the latter declare a dividend upon the trust certificates allotted to the shareholders of any one corporation payable out of the profits received from such corporation. On the contrary, their duty is to blend all the profits received from all the corporations into one grand mass, and from that aggregation of profits ■ declare such dividends as they in their judgment deem appropriate, to be proportionately distributed to the holder of each trust certificate.
To emphasize these positions it may be well to quote the precise language of the deed.
“ profits :
“ The profits arising from the business of each corporation shall be paid over by it to the board hereby created, and the aggregate of said profits, or such amounts as may be designated for dividends, shall be proportionately distributed *187 by said board, at such time as it may determine, to the-holders of the certificates issued bv said board for capital stock, as hereinbefore provided.”
Thus it will be seen that these dividends are not to be declared or distributed upon the aggregate capital stock of' the corporations, which is to be turned over to and held by the trustees, but upon what might not inaptly, in view of these peculiar facts, be termed the trust board’s capital-stock, namely, the trust certificates.
Thus we have a series of corporations existing and transacting business under the forms of law, without real membership or genuinely qualified direction—mere abstract figments of statutory creation—without life in the concrete or-underlying association. Every share of stock has been practically surrendered and vital membership resigned. With the transfer to the eleven trustees, the shareholders cease to occupy the position of cestuis que trustent with regard to the directors of the various corporations. In lieu thereof, they accept substituted membership in an unincorporated board, and an entirely new, independent and exclusive trust relation with the trustees of that board. Nor are the trustees, as transferees of the capital stock of the various corporations, in any just sense genuine members thereof. They have no beneficial interest therein. Dividends are not declarable thereon, and, if they were, would not be payable to them in their own right, nor as-.trustees for the shareholders in the particular corporation which had earned the dividend. Nor could the owners of' the trust certificates, “ proportionately distributed ” to such corporate shareholders, follow such dividend and require-the trustees to account to them therefor. Whatever dividends are to be declared by the trustees must be so declared and paid from the aggregate fund ; and whatever rights the holders of such trust certificates may have as against the-trustees, can only be enforced by the totality of certificate holders or a representative of that body. Again, the relation existing under the deed between the trustees of the? *188 trust and the directors of the corporations is not, as we have seen, the usual relation of shareholders and directors, but a ■strict contract relation. Ordinarily, the directors of a corporation may use their honest judgment with regard to •dividends, and also as to the judicious application of profits. Here, however, the deed treats the directors of the various corporations as mere agents of the trust board, and in ■unqualified terms requires them to “pay over the profits.” ’The effect of this would be the same, even if individual members of the trust board were also shareholders in the ■corporations. As such individuals, they would transfer their shares to the board and accept from the board their •due proportion of the trust certificates. The board, as a board, takes all the shares of all the corporations, and the ■corporate shareholders, whether members of the trust board ■or not, by transferring their shares to these trustees, and ■accepting from the latter trust certificates, in effect, abandon their corporations, relinquish their powers as shareholders, resign their functions as corporators, and look solely to the trust board for future guidance, control and profit.
It is the first time in the history of corporations that we have heard of a double trust in their management and control—one set of trustees elected formally to manage the ■corporate affairs, and a second set created to manage the first—the shareholders in seventeen corporations leaving tlieir functions with regard to their regular directors to be .thought out and performed by them by what amounts to a board of guardians.
Let us now look at the situation of the directors of the various corporations as pointed out in the deed. The statute requires that each director shall be a stockholder. 'Consequently, each director must own at least one share. But the deed requires the transfer to the trustees of every ■share in every corporation. How, these trustees certainly ■cannot, under the terms of their trust, sell or pledge a sin\gle share of the stock thus held by them. This stock in ■their hands is substantially dead. It evidences no individ *189 ual right. It measures no proportionate interest. In fact,, it serves in the future no purpose whatever, except to furnish the trust board with formal voting power to control the direction of all the corporations. It would seem to be impossible, therefore, to qualify the boards of directors in the various corporations. The draughtsman, however, attempted to provide for this difficulty by the following provision :
“ The said board may transfer, from time to time, to-such persons as it may be desired to constitute trustees, or directors, or other officers of corporations, so many of the-shares as may be necessary for that purpose, to be held by them subject to the provisions of this instrument. Such transfers may be executed by the president and treasurer of the board in behalf of, and as attorneys for, the board for-that purpose, and to be retransferred when so requested by the board.”
Here there is no pretense of a sale. The “ necessary shares may be transferred to such persons as the board may desire to constitute directors, to be held by such directors “subject to the provisions” of the trust deed and to be “retransferred” when so requested by the board. This clearly bears out my previous observation that these corporations exist as creatures of the law, and are conducting business under its authority without a single genuinely qualified director; in fact, without directors at all in the ordinary and legal sense. Every director in every one of the corporations is necessarily the mere creature and agent of the trust board. The share of stock put in his name is not his property, nor can a dividend ever be declared upon it to him or to any one else. For that very share a trust certificate has, in fact, already been issued to him or' to some one else. Plainly, then, the holding of this lifeless share of stock by the director, without beneficial interest and at the will of the board—“ to be retransferred when requested is not a compliance with the statutory require- *190 merits that the directors shall “ respectively be stockholders in such company.”
There is further evidence upon the face of the deed, of the difficulties which surrounded the execution of the contemplated project. Each refinery might have had debts, and all probably had assets outside of its plant. It would have been impracticable to issue trust certificates in proportion to the capital stock of each company, for one company might be capitalized for much more than its real value, while another might be capitalized for less, and still another for its precise value. It was necessary, therefore, to distribute the trust certificates in proportion to the real value of each property. But, here again, there, was a difficulty growing •out of the complexity of mortgages upon the realty, float- ' ing debt and the possession of raw material and other personal property. It was clear that the interests in the trust board, which were to be substituted for the corporate shares, must be proportioned upon the realty, fixtures and machinery ■of each company (freed from debt), exclusive of the transmutable stock and other personal property ; in other words, upon the naked plant. Accordingly, provision is made in the deed that each refinery and the corporation to which it belongs shall be freed from liability and indebtedness by the parties interested in it; or such parties, if the board ¡shall approve, may provide in cash for such indebtedness or liability, leaving the same to stand at the pleasure of the board. So much for the debts. Then as to the assets other than the plant, provision is made for their appraisal by five •of the eleven trustees, and the values thus fixed are to be paid in cash by the trust board to the treasurer of each corporation. Of course, all this involved the necessity of providing the trust board with the means of raising money, and it was, undoubtedly, with this view that under the head of fiscal arrangements authority was given to raise the necessary funds by mortgage, “ to be made by the corporations, or •either, any or all of them, on their property, and by such other means as shall be satisfactory to such board.”
*191 This covers, in a general way, the methods adopted by the parties to produce cohesion as between themselves. But they did not stop there. Provision is made for the .gathering in of every other existing refinery (“ in every instance to be incorporated ”), and, in fact, four others have joined the combination since the deed was signed by the ■original partnerships and corporations; and the evidence shows that in the entire country but five sugar refineries of the character in question remain outside of the combination. The trust board is also provided with additional means for adding recruits to the combination, and to facilitate general adhesion thereto. It was with this view that the fifteen per cent, of the trust certificates allotted to each refinery was to be reserved, “ subject to be disposed of by the board,” for—among other purposes—the “acquisition ■of other refineries to become parties to this deedand lest the accretions of membership should exhaust this fifteen per •cent., as well as what might be derived through the exercise of the other powers of the board, the means is afforded of, “ from time to time,” increasing the trust certificates even beyond the $50,000,000 It is not strange that this extraordinary document should close with a provision for strict •secrecy—that “ the said deed shall not be shown or delivered •to any corporation, firm, person or persons whatsoever, ■except by the express direction and order of the board.”
We now come to the legal question—is this a combination of corporations, or merely a combination of stockholders % The defendant claims that unless authority to •sign the trust deed, given by the directors of each corporation at a regular board meeting, is affirmatively proved, the •acts complained of are not corporate acts. This contention ignores the fact, proved in the case, that the corporate acts provided for by the deed have actually been performed by the corporations and that the deed has in fact been put in -execution. The proof shows that the deed was actually signed by the firms whose names appear to be appended rthereto ; and as to the corporations by persons professing to *192 represent them ; that the firms were turned into corporations, pursuant to the requirements of the deed ; that the-shares of capital stock of all the corporations (including the-four that have since come in) were, with a single exception, transferred to the trust board ; that the trust board has issued and distributed the trust certificates; and that a dividend of two and one-half per cent, has actually been declared and paid upon such certificates."
Where did the trust board obtain the money with which to make that dividend ? ¡Necessarily from each corporation,, under the provision that the profits arising from the business-of each corporation shall be paid over by it to the board hereby created. Such certainly is the fair implication from the fact of the receipt by the trust board of the necessary-funds from the various corporations in connection with a deed purporting to be signed by their officers and containing this provision. Thus the corporations acted upon the-deed and performed one of the most vital duties imposed-upon them thereby. Further, it appears that all the capital-stock of- all the corporations was actually transferred to the trust board, not, as we have already seen, in severalty, ñoras tenants in common, but as joint tenants. That, at once, necessarily disqualified every director in every corporation,, unless indeed a single share was reserved or transferred to-each of such directors under the authority of the- clause of the trust deed to which we have referred. It that was done,, and as these directors have continued to perform their ordinary functions, we must assume that it was done, then the-deed again became an executed contract, and the directors held their offices or continued to perform their duties by the-force of its provisions. Still further, we find a strong implication that mortgages were placed upon the property of' same of the corporations, by corporate act, pursuant to the-provisions of the deed. In the case of this particular defendant the stockholders after resolving to join the combination changed their mind and determined to revoke previous action looking to that end. Thereupon,” Mr. Searles,- who» *193 is one of the eleven members of the trust board, offered them $325,000 in cash for their stock, with the additional privilege of working up all the raw material on hand and making what they could out of it. This was accepted and the bargain carried' out. Mr. Searles received the shares representing the naked plant, denuded of stock, raw material and other assets, and the shareholders received $325,000 and what they had made out of everything save the plant. Now, Mr. Searles was not acting for himself alone, but evidently for the persons as well who had signed the deed. He tells us how the $325,000 was raised, as follows :
“ Q. Whose money paid this $325,000 ?
“A. . . . Three gentlemen who were trustees of certain funds paid for the stock.
“Q. What funds?
“ A. Funds received by them (these three gentlemen trustees) for mortgages and other matters connected with the organization.
“ Q. What organization ?
“ A. The Sugar Refineries Company.
“ Q. What we call the board, you mean?
“A. Yes.”
Now, as the only mortgages connected with the organization were mortgages upon the property of the corporations, it would seem, to follow that the defendants’ stock was, in effect, purchased under the provision of the deed authorizing the raising of funds “ by mortgage to be made by the corporations, or either, any or all of them on their property.” It is apparent that this was corporate combination. It was a purchase for such corporate combination of corporate property by corporate means.
It also appears in connection with this particular defendant, that Mr. Searles, immediately after the purchase of the stock, became its president and treasurer, put in new directors, and, at once, for reasons satisfactory to himself, discontinued the business. From that hour to this the *194 defendants’ refinery has been closed, and yet a dividend has been declared upon the very trust certificates which were issued to Mr. Searles by the board, upon the transfer to it of the defendants’ capital stock. Mr. Searles, as president and treasurer of the defendant, knew of that dividend, and, as one of the trust board, helped to declare it. He knew, also, that it was realized from the profits of the going corporations, and that the defendant had not contributed a penny to the fund from which it was to be paid.
It really seems unnecessary to dwell further upon this subject. The accumulation of evidence points irresistibly to the complete practical identity of shareholders and corporations, and it is quite impossible to sever the acts of the persons solely interested in these corporations from that of the corporations themselves. The purpose to effect corporate combination cannot be disguised. The form of the contract veil was thin enough, but the acts under it sweep away the gauze and leave the corporate body unclouded and in full view. Mr. Searles was indeed substantially right when he told us that after his purchase of the defendant’s entire stock he “ was the North River Sugar Refinery Company.”
The law on the subject is in harmony with the fact. According to the act of 1848, the signers of the original ■certificate of incorporation and their successors “am a body politic and corporate, in fact and in name, by the name stated in such certificate.” Who are the successors of these original signers? The shareholders, of course. The entire body of shareholders thus constitute the corporation. A corporation or a body politic or a body incorporate,” says Mr. Kyd, “ is a collection of many individuals united into one body under a special denomination, having perpetual succession under an artificial form and vested by the policy of the law with the capacity of acting in several respects as an individval ” (1 Kyd on Corp. 13). It is really an associktion of persons, and the word corporation is but a collective name for the corporators or members (1 Morawetz on Corp. §§ 1, 227 and 474; People ex rel. Bank of Watertown v. *195 Assessors of Watertown, 1 Hill. 616, 620). The shareholders, vested with the corporate powers, are the body corporate, corporation or company (Taylor on Corp. § 50). Chief Justice Marshall, in Providence Bank v. Billings (4 Peters, 562), said that the great object of an incorporation is to bestow the character and properties of individuality on a collective and changing body of men. Mr. Morawetz puts ■it clearly when he says that “ while a corporation may, from one point of view, he considered as an entity, without regard to the corporators who compose it, the fact remains self evident that a corporation is not in reality a person or thing distinct from its constituent parts ” (§ 1). And so the acts of the collective body are the acts of the corporation, and, if unlawful, will work a forfeiture.
In People v. Kingston, etc. Turnpike Co. (23 Wend. 193, 205), Chief Justice Nelson, in a quo warranto proceeding, declared that ‘ ‘ though the proceedings be against the corporate body, it is the acts or omissions of the individual corporators that is the subject of the judgment of the court.”
And this is entirely reasonable. For what is the corporation apart from the whole body of the members or stockholders, clothed with the statutory franchises ? Merely a name. When the whole body of stockholders offend the law of the corporate being, the corporation offends. And who is punished by forfeiture or dissolution because of such •offending ? Not the mere corporate name, but the persons who have actually offended and who have thereby forfeited the franchise which they possessed under that corporate name. The directors are but the agents of the corporation to manage its affairs and carry out the purpose and object of its formation. They are only authorized to do such things as are directly or impliedly directed or authorized by the charter (Abbot v. Amer. Hard Rubber Co., 33 Barb. 578, 591; aff’g 11 Abb. Pr. 204; citing Ang. and Ames, on Corp. § 280). The directors of this defendant could not have bound the corporation by an assent to the deed in question. That deed involved momentous changes in the life *196 and destiny of the corporation, and in the relations of its-shareholders, which were entirely foreign to the general management of its business. Such changes are essendally for the consideration of the corporators themselves, and their united act in the premises (purporting both in the agreement itself and in all the surrounding circumstances to be corporate) is plainly the act of the artificial body composed in the concrete of themselves. Having thus concluded that the acts under consideration were corporate acts, the remaining question is, were they illegal ? This question may b.e divided into two branches. First, had the corporations authority to enter into any partnership arrangement, however innocent in itself ? Such, for example, as would have been perfectly lawful between individuals? Second, was this combination of the latter character or was it inherently unlawful ? Such, for example again, as would have been unlawful between individuals ?
The answer to the question as presented in the first branch must be in the negative It cannot be doubted that the arrangement in question amounted to a partnership between these corporations or a substantial consolidation. Such was the effect of the massing of all the stock of all the corporations and the correlative massing of all tlfe profits of all the corporations. The intention was clearly to share both profits and losses. Such, too, was the effect of uniting all the corporations under practically a single control.
It is well settled that corporations cannot consolidate their funds or form a partnership unless authorized by express-grant or necessary implication ; nor can they enter into any arrangement amounting to a practical consolidation or co-partnership (Angel & Ames, § 272; Taylor, §§ 305, 419-420 ; Green's Brice, 416 ; 1 Morawetz, 376-421, and cases there cited ; New York and Sharon Canal Co. v. Fulton Bank, 7 Wend. 412; Whittenton Mills v. Upton, 10 Gray, 582 ; Marine Bank v. Ogden, 29 Ill. 248). * In the Fulton *197 Bank case, Chief Justice Savage said that the general principles are against the power of corporations to do such acts. 'They have no powers hut such as are granted and such as are necessarily incident to the grant made to them. Corporations at common law have certain powers, but not such as would authorize the forming of a partnership or the consolidation of two companies into one.” It was doubtless because of the recognition of this principle that the acts of 1867 (chap. 960) and 1884 (chap. 367) were passed authorizing consolidations in a certain specified manner and under fixed conditions. The corporations whose conduct we are ■considering have not taken advantage of these acts, doubtless because such acts are limited to corporations organized under any general or special law of this State ”—the promoters of the present combination evidently desiring to ■combine all the refinery corporations in the Union—and they have sought, by the scheme under review, to effect a far ‘broader and deeper purpose than meré corporate consolidation under .these acts. In doing so, they have plainly -abused their powers and have exercised privileges not conferred upon them by law. As legal conclusions, forfeiture •of the defendant’s franchise and dissolution justly follow.
• Mr. Morawetz states the rule with precision (2 Mor. on Corp. § 1024). “ A corporation may incur a forfeiture •of its franchises by the doing of an illegal act. Any act of a corporation which is forbidden by its charter, or by a :general rule of law, and strictly every act which the charter ■does not expressly or impliedly authorize, is unlawful; and if the doing of such act is an injury to the public, it may be sufficient ground of forfeiture.”
The same rule is laid down in Kent, Taylor, Waterman, Kyd, Angel & Ames and Green’s Brice (2 Kent, 312 ; Taylor, §§ 289, 457, 459 ; 2 Waterman, § 427; Kyd, § 479, et seq.; Angel & Ames, §§ 774, 775, 776; Green's Brice, 708, 709 [3 ed.], 787). Waterman says that “ the State is mot required to prove an actual injury ; it is sufficient cause of forfeiture if the act be such as in the nature of things *198 is calculated to produce injury.” The cases all hold the same doctrine, laying down the general rule that the corporate franchises are granted upon a trust or condition that the corporate privileges shall not be abused ; that the corporation undertakes and agrees, upon condition of forfeiture, that it will so manage and conduct its affairs that it shall not become dangerous or hazardous to the safety of the State or community in and with whicli it transacts business-(Ward v. Farwell, 97 Ill. 593) ; and that the franchise may be forfeited and the corporation dissolved for acts ultra vires or for a breach of the trust condition and perversion, of the objects of the grant (Ins. Co. v. Needles, 113 U. 8. 574; People v. Dispensary, etc. of N. Y., 7 Lans. 306 ; People v. Bristol, etc. Turnpike Co., 23 Wend. 221, 235 ; People v. Fishkill, etc. Plank Road Co., 27 Barb. 445 ; State v. Railroad Company, 45 Wisc. 590 ; Ches. & Ohio v. Balt. &. Ohio, 4 Gill and Johnson, 1, 106, 121). These rules rest upon the inherent right of sovereignty. The franchises,, whether resulting from general or special laws, are grants-from the sovereignty of the people. Benefit to the country at large, from the objects for which the corporations are created, constitute the consideration, and in most cases the sole consideration of the grant (Chief Justice Marshall in the Dartmouth College case, 4 Wheaton, 518, 637). It therefore follows logically that when those objects are perverted, when the country suffers injury instead of receiving benefit, the State, because of such misuser, may withdraw the privileges and resume its franchises.*
We might rest upon the conclusion thus arrived at, for it is sufficient to entitle the People to a verdict. As, however, the second branch of the question was fully argued and is fairly up, it becomes my duty to consider it. At the outset, let me say, that the modification by modern jurists of *199 some of the rules laid down in the old English cases is fully recognized. The liberty of contracting is the most important factor of commercial life, and it should only be abridged when it is clear that the public must be injuriously affected by its unrestrained exercise in a particular case. Freedom of all kinds may be abused, and commercial freedom, as well as any other, may degenerate into license. The develop ment of judical thought in regard to contracts in restraint of trade has been especially marked. The ancient doctrine upon that head has been weakened and modified to such a degree that but little, if any of it, is left. In the Diamond Match Co. v. Roeber (106 N. Y. 473*), it was held that “ a party may legally purchase the trade and business of another for the very purpose of preventing competition, and the validity of the contract, if supported by a consideration, will depend upon its reasonableness as between the parties.” It was also held that a restraint of trade was not general, but partial, though covering the whole country with the exception of Nevada and Montana. Indeed excessive competition may sometimes result in actual injury to the public, and' anti-competitive contracts to avert personal ruin may be perfectly reasonable. It is only when such contracts are publicly oppressive that they become unreasonable and are condemned as against public policy (Horner v. Graves, 7 Bing. 735 ).†
But all the cases, ancient and modern, agree that a combination, the tendency of which is to prevent general competition and to control prices, is detrimental to the public and consequently unlawful. This seems to be conceded by one of the learned counsel for the defendant. Judge *200 Daly sums up the result of his examination of the cases in these words : “That combinations are unlawful, the design and effect of which necessarily is to give the party combining a monopoly more or less, for any length of time, of the manufacture or sale of a commodity ... or to regulate and control the price of a commodity ... or to secure any pecuniary advantage in restraint of trade which would be injurious to the community.”
Now it seems to me to be entirely clear that the agreement which has been previously analyzed, brings this case conspicuously within the above rule. It is not a case where a few individuals in a limitéd locality have united for mutual protection against ruinous competition. It is the case of great capitalists uniting their enormous wealth in mighty corporations and utilizing the franchises granted to them by the People to oppress the people. First, they utilize the corporate franchises to guard themselves against the dangers incident to personal association; and, second, they centralize these franchises in a single, gigantic and irresponsible power, furnished with every delegated facility-for regulating and controlling at will, not only in the State, but throughout the entire country, the production and price of a particular and necessary article of commerce. When I say an irresponsible power, I mean no reflection upon the gentlemen personally in whom the power is vested. I mean a body of individuals, who, in their trust capacity, are entirely outside of the corporate being, and are subject to no legislative authority.
Combinations that were pigmies in comparison with the present have been repeatedly denounced by the courts and pronounced to be unlawful, as tending to breed monopolies (Hooker v. Vandewater, 4 Denio, 349; Stanton v. Allen, 5 Id. 434; Morris Run Coal Co. v. Barclay Coal Co., 68 Penn. St. 186; Salt Co. v. Guthrie, 35 Ohio St. 672; Craft v. McConoughy, 79 Ill. 346; Hoffman v. Brooks, 11 Weekly Law Bul. 358*).
*201 In Hooker v. Vandewater it was held that an agreement between the proprietors of five lines of boats, engaged in the business of forwarders on the Erie and Oswego Canals, to run for the remainder of the season at certain rates for freight and passage then agreed upon, and to divide the net earnings among themselves in certain proportions, was a conspiracy to commit an act injurious to trade and consequently void'. The object expressed in the agreement was the “ establishing and maintaining fair and uniform rates of freight and equalizing the business among themselves, and to avoid all unnecessary expense in doing the same.” Of this Jewett, J., observed : “ The object of the agreement, as expressed in the written contract, was plausible enough, but it was impossible to conceal the real intention.” He adds that, “ the great if not the sole object of the agreement was to destroy rivalry and keep up the price to certain rates fixed by themselves.”
Stanton v. Allen was a very similar case where the court, without considering the conspiracy statute, held that the agreement was void at common law as contravening public policy and injurious to the interest of the State.
In Morris Run v. Barclay Coal Company, the combining mines were not the only ones in the region, much less in the country. It appeared that there was another mine in the region not within the combination, but that tl;e product of that mine could only reach the market (sought to be controlled) by tidewater. It also appeared that there were other mines in two other counties of the State, though the quantities taken from them were small. Still the court held that the combination was not only illegal but a criminal offense. The common law origin of this doctrine was dwelt upon—that while an individual may do many things to oppress others, which though morally wrong are not the *202 subject of legal discipline, he cannot lawfully combine with< another to do the same things. The wrong which, whem done by the individual, cannot be redressed, becomes a conspiracy the moment it is effected, by two or more in combination. As the learned judge (Ag-new) observed, “ the-combination has a power in its confederated form which no-individual action can confer. The public interest must: succumb to it, for it has left no competition free to correct its baneful influences.”
In Salt Co. v. Guthrie, the agreement was between the-producers of salt in a limited-locality. The court held the agreement void, although the price of the commodity had not been unreasonably advanced. The tendency of the-agreement was sufficient; the court remarked that it was- “ no answer to say that competition in the salt trade was-not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to-inquire as to the degree of injury inflicted upon the public it is enough to know that the inevitable tendency of such-contracts is injurious to the public.”
In Craft v. McConoughy, the agreement was between, all the grain producers in but a single town. It was held to be void, the court saying that “while the agreement upon its face would seem to indicate that the parties had formed a co-partnership for trading in grain, yet from the terms of the contract and the other proof in the record, it is-apparent that the true object was to form a secret combination and enable the parties, by secret and fraudulent means,, to control the price of grain.” There is no distinguishing significance, however, in the use of the word fraudulent in this connection, as the only fraud in the case was the general fraud upon the public involved in making purchases of land and property to aid the combination and render it invincible. This case, too, is directly opposed to the ingenious distinction sought to be made between a limited product and things capable of being produced in indefinite-quantities.
*203 Hoffman v. Brooks is also an instructive and well-reasoned case. The combination there was between sellers of tobacco for the purpose of destroying competition among themselves. It was held to be unlawful, the court using this pointed language : “ The presumption is always against the validity of such agreements.” And they will not be enforced “ when they include all those engaged in any business in a large city or district, are unlimited in duration, and are manifestly intended, by the surrender of individual discretion, by the arbitrary fixing of prices, or by any of the methods to which the hope of gain makes human ingenuity so fruitful, to strangle competition outright and breed monopolies.”
The cases where anti-competitive agreements were upheld had none of the distinguishing characteristics of monopoly, but were plainly fair contracts entered into for mutual protection, and were not injurious to the public: such, for instance, as Ontario Salt Co. v. Merchants’ Salt Co. (18 Grant’s Chancery [ U. S.] 540), Wickens v. Evans (3 Y. & J. 318), Mogul S. S. Co. v. McGregor (L. R. 15 Q. B. 476), Skrainka v. Scharringhausen (8 Mo. App. 522).
In the Canadian case first cited, the learned Vice-Chancellor declared that “ it was out of the question to say that the agreement had for its object the creation of a monopoly, as the parties were not the only persons engaged in the production of salt in the province,” and, after examining the particular facts of that case, he adds : “ What is this more than two persons carrying on the same trade, binding themselves not to undersell each other ?”
Wickens v. Evans was still freer from the element of monopoly. The agreement was confined to three trunk-makers, who divided England into three districts, each taking one and limiting himself to one. The court said that the restraint of trade was but partial, and that there was no monopoly except as between the three parties, “ because every other man may come into their districts and vend his goods.”
*204 The Mogul S. S. Co. case, though cited by the defend■ant, seems to be strongly against its contention. The action was in equity, and an injunction to restrain the wrong was refused. Lord Coleridge placed his judgment entirely upon the adequacy of the legal remedy and the consequent impropriety of equitable interference. "But, assuming the ¡allegations of the bill to be true (which question of fact was not then passed upon), he denounced the so-called “ conference” as a criminal and indictable conspiracy, and therefore actionable. “It is clear,” he observed, “that ¡supposing the allegations here could be established in point •of fact, the damages in such a case might be extremely heavy. They .might be what are called exemplary, or vindictive, damages ; such, indeed, as it might severely tax the resources of the conference to pay. That, I think, cannot be denied.”
It seems that the plaintiffs acted on tins suggestion of Lord Coleridge, and brought an action at law, in which, however, they were again unsuccessful. The judgment here was also pronounced by Lord Coleridge (57 Law Journal Reports, 2 Q. B. 541), who ruled that as there was no evidence of malice or personal ill-will,, the plaintiffs ¡could not recover. The learned chief justice held that the “ conference ” was not unlawful merely because it offered a rebate of five per cent, upon all freights paid by those ¡shippers who shipped their cargoes on .board conference vessels alone, to the exclusion of the plaintiff’s vessels. It seems to me,” said Lord Coleridge, “ that 'it was no ¡more in restraint of trade, as that phrase is used for the purpose of avoiding contracts, than if two tailors in a village agreed to give their customers five per cent, off their bills at Christmas, on condition of their customers dealing with them, and with them alone.”
Even there, however, Lord Coleridge said that if there had been personal malice or ill-will, he did not doubt that the action would lie.
In the Missouri case cited, the agreement was upheld *205 because the restraint was partial. “ The partial nature of the restraint in the case before ns,” said the court, “ seems-to be not colorable, but real. The agreement is amongst the quarry men of one district of one city and it does not appear that it embraces all of them. The contract is not of such a nature that it is apparent from its -terms that it tends-to deprive men of employment, unduly raise prices, cause a monopoly or put' an end to competition.” While the-judgment in this case sustained the agreement, because it was inoffensive as thus limited, the opinion of the court is-exceedingly strong in its condemnation of agreements tending to monopoly. “So far,” continues the court, “as the-odious nature of monopoly is concerned, that has become-more apparent as commerce has increased. The danger to-be apprehended from the accumulation of wealth and: power in the hands of gieat corporations, and the abuses by which large capitalists may so combine as to relax or destroy competition in trade, are matters of public concern,, and the essential question is one of monopoly and of injury to the public.”
The same danger is clearly pointed out by our own» court of appeals in the late case of Leslie v. Lorillard (110 N. Y. 519); where Gbay, J., speaking of agreements in restraint of trade, observed : “ In later times the danger in. such agreements seems only readily to exist when corporations are parties to them, for their means and strength! would better enable them to buy off rivalry and create monopolies.” And again, speaking of corporations, “ if allowed to engage, without supervision, in subjects of enterprise foreign to their charters, or if permitted unrestrainedly to monopolize the avenues to that industry in' which they are engaged, they become a public menace against which public policy and statutes design protection.”'
The principles established by these cases seem to cover and fully meet the main position taken in support of the present agreement. There ¿re, however, one or two minor-considerations which should be noticed. The first is, that; *206 this agreement seems to avoid the pitfall of many of the oases, by carefully omitting any specific authority to fix prices. Such authority, however, is plainly covered by the enormous general power conferred upon the trust board. The greater includes the less, and any specification on this head would have been superfluous. Even 'Mr. Carter finally yielded this point. “ I agree,” he says, “ in the broadest manner, that the power exists there ; to fix a price eventually, it is for the interests of the parties to fix the price.” The truth is, that under this agreement the trust board can direct the business movements of these seventeen or eighteen corporations, as absolutely as the general of a great army can direct the movements of its various corps d’armee. But a director may rebel, says the learned counsel. Well, even in war there is a possibility that a corps commander may disobey the orders of his chief, but discipline and change of military agency speedily follow. There is still less likelihood of mutiny in boards of directors who practically take office under the trust board (and subject to the provisions of the trust deed), who are appointed by the trust chiefs, and removed by a mere re-transfer of stock “ upon request,” at any time, and above all, who are spurred to active and zealous obedience by the hope—nay, by the substantial certainty—of gain. For there is nothing, whatever, to prevent the trustees from filling these corporate boards with their own members, or with other holders of their own trust certificates.
The trust board is indeed clothed with power far in excess of the ordinary stockholders of a corporation. It is in substance both stockholders and directors, and this union of force embraces every share of stock and every director in every corporation. What need then for specific detail in the general delegation of power? The board, under this executed deed, can close every refinery at will, close some and open others, limit the purchase of raw material (thus jeopai'dizing and in a considerable degree controlling its production), artificially limit the production of refined *207 ■sugar, enhance the price to enrich themselves and their ■associates at the public expense, and depress the price when necessary to crush out and impoverish a foolhardy rival; in brief, can come as near to creating an absolute monopoly as is possible under the social, political and economic conditions of to-day.
We are told that this cannot be accomplished with regard to an article like sugar which can be indefinitely produced by the application of capital and labor, and that monopoly is possible only where the supply of the article is restricted by nature. This position has been maintained in an argument of exceeding brilliancy, which I confess to 'have enjoyed as one always enjoys a persuasive manner of presentation. But while the argument was most ingenious it was neither sound nor—T say it with respect—plausible. ■Of course, a monopoly in the strict, technical and absolute ■sense cannot be thus created ; but a monopoly in a legal •sense can. The monopoly with which the law deals is not limited to the strict equivalent of royal grants or people’s j patents. Any combination, the tendency of which is to| prevent competition in its broad and general sense and toj •control, and thus at will enhance, prices to the detriment of the public, is a legal monopoly. And this rule is applicable! to every monopoly whether the supply be restricted by mature or susceptible of indefinite production. The diffi•eulty of effecting the unlawful purpose may be greater in the one case than in the other, but it is never impossible. Nor need it be permanent or complete. It is enough that -it may be even temporarily and partially successful. The •question in the end is—does it inevitably tend to public injury %
Why, then, does not this trust board combine all of •■these unlawful purposes with ample power of accomplishment ? Theoretically, it cannot prevent other capitalists from coming forward and utilizing their means in combination with labor, but practically it can. The struggle would vbe an unequal, and except under powerful, unusual and *208 extraordinary conditions, impossible. A vast harvest could be reaped at the expense of the public before the foundation of the competitive edifice could be thoroughly laid. Nor could the power of the combination be defeated by outside forces. The undue enhancing of prices might draw to the locality the attention of the foreign commercial world. Bui the argument here overlooks the laws of the United States- and the duties imposed by those laws upon imports. It overlooks, too, the expense of transportation and handling, -and the delays incident thereto. The harvest could again be reaped at the public expense before the advent of competition, and that harvest could then be utilized, by the sudden lowering of prices, to the repression of the foreign competitor. Such, at least, is the tendency of the combination, and such its practical power.
The defendant’s whole argument on this head is based upon theory rather than fact, just as its earlier argument, with regard to the corporation, is based upon legal form rather than substance.
The doctrines of political economy which have been-pressed upon us are based upon normal conditions, and have-no bearing whatever upon combinations organized for the express purpose of surmounting and subverting those conditions.
Lastly, this appeal to the law is criticised as an interference with a natural state of things. The unnatural tiling i& said to be the law, when it attempts to check the natural-order. Unfortunately for this argument, it is the combination which has resorted to what it calls the unnatural thing. It was not content with natural partnerships or associations of individuals, but resorted to the device of corporate artificiality to effect its ends. Having asked and accepted the-favor of the law, it cannot complain that it is taken to task for grossly offending its letter and spirit.
Fortunately the law is able to protect itself against abuses of the privileges which it grants. And while further legislation, both preventive and disciplinary, may be *209 suitable to check and punish exceptional wrongs, yet there is existing, to use the phrase of a distinguished English judge in a noted case, “plain law and plain sense ” enough to deal with corporate abuses like the present—abuses which* if allowed- to thrive and become general, must inevitably lead to the oppression of the people and ultimately to the subversion of their political rights.
■ Again, the legal results justly follow—forfeiture and dissolution.
Let me say, in conclusion, that it would quite unnecessarily belittle the discussion of this momentous question to consider the minor charges presented by The People.
The judgment should rest upon the broad and main issue. There it rests with a sense of fitting proportion ; and there it should be left.
For these reasons, the defendant’s motion must be denied, and the plaintiff’s granted.
The judgment accordingly ordered was settled on notice, after full discussion of its terms (see p. 225 below).
Barrett, J., said : I have carefully considered the form of the decree, and have made some amendments designed to effect clearness. The only amendments which materially differ from the form proposed are the striking out of the clause which substantially requires the receiver’s sureties to-justify on notice to the attorney-general, and the provision-which would limit the receiver in applying to the court for instructions to motions on five days’ notice to the attorney-general. The former is unusual, and entirely unnecessary-in view of the requirement that all moneys shall be deposited in a trust company, to be drawn out only on the order of the court, upon notice to both parties. The latter provision might seriously hamper the receiver in the performance of his duties, as the occasion may arise when the receiver should be free, without delay, to ask the advice and instruction of the court. There should be no- technical *210 obstruction to the receiver’s right and duty to seek at any time the opinion of the court of which he is the officer. It seems to me to be wiser and fairer to require notice to both parties of any application against the receiver, and I have accordingly reformed the provision in that direction.
[Some remarks on selection of receiver are here omitted.]
Note on Forfeiture op Charter and Survival of Franchises.
1. Forfeiture by breach, ipso facto.
2. Forfeiture by act of Legislature
3. Forfeiture by judicial decree.
4. -duty of attorney-general.
5. Effect of forfeiture.
6. Form of judgment.
[As to voluntary dissolution, see pp. 227, 281, below.]
1. Forfeiture by breach, ipso facto.] The Legislature in chartering a corporation has the power to provide that in case of default in complying with its terms, the corporate franchises thereby granted shall ipso facto, without intervention of the courts, be deemed forfeited and terminated, and any party aggrieved may subsequently question its corporate existence without any suit to enforce a forfeiture. Wait on Insolv. Corp. § 406, citing “Brooklyn Steam Transit Co. v. City of Brooklyn, 78 N. Y. 524. See Matter of Brooklyn, Winfield and Newtown Ry. Co., 72 N. Y. 245 ; s. c. again, 75 Id. 835.”
Failure to exercise the franchise as required operates ipso facto as a dissolution. Comm. v. Lykens Water Co., 110 Pa. 391; s. c., 1 Cent. 219.
2. Forfeiture by act of Legislature.) The reservation of a right to alter or repeal will not empower the Legislature to impair the vested rights of shareholders. [Citing authorities.] Mills v. Cent. R. R. Co. (N. J.), 2 Cent. 241, 243.
When the legislature reserves the right to repeal a charter on the happening of a certain event, it may so enact the repeal whenever the event happens, without first invoking the judgment of a court. [Citing authorities.] Comm. v Lykens Water Co. (supra.)
For -the most recent cases as to the power of the State to resume the franchises of a private corporation, see State v. Minnesota Central, etc., 36 Minn. 246 ; s. c., 30 Northwestern R. 816 ; Darnell v. State, 48 Ark. 321; s. c., 3 Southwestern R. 365.
As to the extent in which the principles above and below stated are applied to the case of a municipal corporation upon its dissolution or forfeiture of its charter, see Meriwether v. Garrett, 102 U. S. 472 : *211 Barkley v. Levee Commissioners, 93 Id. 258; Mobile v. Watson, 116 Id. 289; Broughton v. Pensacola, 93 Id. 266; Mount Pleasant v. Beckwith, 100 Id. 514 ; Laramie County v. Albany County, 92 Id. 307; District of Columbia v. Cluss, 103 Id. 705; United States v. Memphis, 97 Id. 284; Louisiana v. Pilsbury, 105 Id. 278.
3. Forfeiture by judicial decree.J The remedies for judicial dissolution or forfeiture are stated in a note to 9 Abb. N. C. 162, 165. The grounds upon which such forfeiture may be adjudged are well stated with a review of recent authorities in Wait on Insolvent Corporations, 336, § 408, etc.
For the most recent cases on grounds of forfeiture, see People v. Natl. Sav. Bk., (Ill.) 11 Northeastern R. 170; s. c., 8 Western Rep. 460 (breach of condition precedent as to subscription and commencing business); Greenbrier Lumber Co. v. Ward (W. Va.), 3 Southeastern R. 227 (failure to pay tax) ; Holman v. State, 105 Ind. 569 ; s. c., 3 Western Rep. 744 (non-payment of capital) ; Town of Searcy v. Yarnell, 47 Ark. 269 (failure to pay capital, hold elections, etc.); Chicago, &c. R. R. Co. v. Stafford County Com’rs, 36 Kans. 121; s. c., 12 Pacific Rep. 593 (delay to subscribe capital); In re Shakopee Iron & Brass Works v. Cole, (Minn.) 33 Northwestern R. 219 (failure to file certificate) ; N. Y. Cable R. R. Co. v. Mayor, etc. of N. Y., 104 N. Y. 1; s. c., 6 Centr. R. 56, 72 (defect in articles of association and affidavits annexed).
As to injunction for failure to pay tax, see Re Faure Electric Light & Force Co. and Re New York File & Sharpening Co. (N. J.) 4 Centr. Rep. 143, 144; State v. Am. Glucose Co. (N. J.) 4 Id. 142.
4. —Duty of attorney-general. ¡ The duty of the attorney-general to ’bring an action to annul a charter may depend on the direction of the Legislature or leave of court or his own sound discretion according to the nature of the case. N. Y. Code Civ. Pro. § 1786 (dissolution); § 1797 (annulment for fraud); § 1798 (violation of law or usurpation of power) ; § 1948 (usurpation). And see State v. Attorney-general, 30 La. Ann. 954.
So long as the corporate rights and franchises of a corporation have not been adjudged to be forfeited in an action brought against it by the people, the fact that it is alleged to be insolvent and a receiver has been appointed in an action brought against it, does not authorize the court to restrain the receiver from proceeding to construct the road as authorized by the charter. Moran v. Lydecker, 27 Hun, 582.
5. — Effect of fbrfeiture.] The conflict of opinion which has prevailed as to the effect of forfeiture upon the franchises and property of the corporation, has just been determined by the court of appeals in the decision of People v. O’Brien, which will doubtless shortly appear in 111 N. Y. ; affirming 45 Hun, 519.
*212 The points there settled-by the court of appeals are:
1. The franchises of a corporation (other than the franchise to be a corporation and to act. in the future) and its contracts made in the exercise thereof, survive the legislative or judicial forfeiture of its charter, unless provision for compensation be made; for the reserved power of repeal, which now applies to charters generally, is subject to the constitutional prohibitions against impairing the obligation of contracts, and against taking private property without compensation.
[Compare People ex rel. Schurz v. Cook, 110 N. Y. 443.]
2. Neither an express limitation in the charter of the corporate life-by a specific period, nor the constitutional or statutory power to repeal charters, constitute any limitation on the permanent or absolute character of a grant to a corporation,—such as a grant by a municipal corporation to a street railroad company of the right to construct and run. their road. Such a franchise is not merely a license, but is property of a transferrable nature and cannot be destroyed by a repeal or forfeiture of the charter of the corporation.
3. The franchises which are purely personal and incorporeal,—such as continued corporate existence, and the continued exercise of corporate powers; necessarily expire with the extinction of corporate life, unless special provision is otherwise made; but the right to property held, and the validity of contracts made, in virtue of those franchises, do not expire with the extinction of corporate life.
[As to this distinction between franchises, see Southern Pac. R. Co. v. Orton, 32 Fed. Rep. 457. See also Wait on Insol. Corp. § 419.]
In applying these principles to the case at bar, the court in People v. O’Erien held incidentally, that the consent obtained by the Broadway Railroad Company from the city, its conditions being complied with on the part of the company, were property", protected by the Constitution ; that upon the dissolution of the corporation in an action brought in the name of the people by the attorney-general, and the appointment of a receiver under L. 1886, c. 310, the State no longer had an interest entitling it to interpose by a new action (in aid of the former action) to determine conflicting questions between stockholders, bondholders and other creditors and others; and the Legislature had no power to impair the rights of stockholders and creditors; and inasmuch as the act directing the attorney-general how to proceed “whenever any corporation organized under the laws of State shall be annulled and dissolved by an act of the Legislature ” (L. 1886, c. 310; Jan. 11) became a law some days after the act annulling and dissolving the Broadway Railroad Company (L. 1886, c. 268, Jan. 4), the later act (c. 310) did not apply to this company, there being nothing in its terms to indicate an intent to give it retroactive effect; but even if it *213 were retroactive it would be unconstitutional, as making the receiver in effect a.referee and judge, to take evidence of claims and determine its materiality; and as restricting recovery by mortgagees to the amount paid by them, and requiring them to accept payment before maturity; and as attempting to vest in a receiver the assets of the dissolved corporation without notice to the directors who, by the general provisions of law, had already become trustees for stockholders and creditors.
The circumstances in reference to the relative dates of the statutes above mentioned were in brief that the bills which became chapter 310 and 268 respectively, were reported to the Legislature together, by a committee of the senate, to be enacted together; but in the course of Legislative procedure the bill dissolving the company became a law some days before the bill directing the attorney-general how to proceed “ whenever the Legislature shall dissolve ” a corporation.
The reader concerned in the application of these principles will be interested in the following condensed statement of the Opinion rendered to that committee by their counsel, Clarence A. Seward and Roscoe Conkling, in 1886.
The Legislative power to annul and dissolve a corporation and to repeal its charter has existed for nearly sixty years.
(a.) The revised statutes of 1829 (1 R. S. tit. 3, ch. 18, § 8, p. 559), provide that “the charter of every corporation that shall hereafter be granted by the Legislature shall be subject to alteration, suspension and repeal in the discretion of the Legislature.”
(b.) The Constitution of 1846 (Art. VIII., § 1), provides that: “ Corporations may be formed under general laws. . . . All general laws and special acts passed pursuant to this section may be altered from time to time or repealed.”
(c.) The General Railroad Act of 1850, after providing for the formation by any number of persons of railroad corporations by filing l articles of association, further (§ 1) provides: “ And all persons who shall become stockholders in such company shall be a corporation and be subject to the provisions contained in title 3 of chapter 18 of the first part of the Revised Statutes, except the provisions contained in the seventh section of said title.”
This would seem to have been sufficient as a provision making the incorporation of a railway subordinate to the power to annul, dissolve -and repeal; but, to conclude the question, it was further provided by section 48 of said Act of 1850, that “ the Legislature may at any time annul or dissolve any corporation formed under this Act.”
(d.) Chapter 252 of the Laws of 1884, under which the Broadway Surface Railroad Company was organized by filing articles of associa *214 tion, provides (§ 1) that “ such corporation shall be subject to all the-liabilities imposed by this act, or by the act entitled ‘ an Act to authorize the formation of railroad corporations, and to regulate the same, passed April 2, 1880, except,’ ” etc. This provision, therefore, brought the Broadway Company directly under the above quoted provisions of the Revised Statutes and the Act of 1850. But, to conclude-the question, under the Act of 1884 also, it was further therein provided (§ 19) that the “ Legislature may, at any time alter, amend or repeal this Act.”
That these provisions are lawful; that they are in force; that they' apply to all railway corporations, whether created under general laws- or by special act, and that they may be lawfully enforced without impairing the obligation of contracts, has been so frequently judicially assorted that there is no necessity for defending the positions a priori. Miller v. State, 15 Wall. 478, 492, 493 ; Brooklyn v. City, 78 N. Y. 526, 531; Troy v. Kerr, 17 Barb. 581, 603; Suydam v. Moore, 8 Id. 358; Erie v. Casey, 26 Pa. St. 287, 301; White v. Syracuse, 14 Barb. 560; Northern R. R. Co. v. Miller, 10 Id. 260, 282; Pennsylvania College Cases, 13 Wall. 190 ; Miners’ Bank v. U. S., 1 Green (Iowa), 553; Crease v. Babcock, 23 Pick. 335; Lothrop v. Stedman, 13 Blatch. 134; Greenwood v. Freight Co., 105 U. S. 13, 17; Worcester v. Worcester Co., 109 Mass. 103; Railroad Co. v. Georgia, 98 U. S. 359; Tomlinson v. Jessup, 15 Wall. 454; Railroad Co. v. Maine, 96 U. S. 499; State v. Curran, 12 Ark. 321; N. Y. Cable Co. v. Chambers St., etc., 40 Hun. 29).
The Legislature, therefore, had lawful authority to pass the act entitled “ An Act to dissolve the Broadway Surface Railroad Company.” The exercise of this power by the Legislature is to be-presumed to have been warranted by the Constitution. Matter of 34th St. R. R. Co., 102 N. Y. 343, 350; People v. Comstock, 78 Id. 356; People v. Flagg, 46 Id. 401.
II. The legal-status of a railroad corporation, over which impends, the possible exercise of this reserved power by the Legislature, is-clearly that of a tenant for life, whose life depends upon the will of the Legislature, or, as was said in Erie v. Casey (26 Pa. St. 287, 308, 309), “ The corporation had an estate at will—they held the corporate-franchises at the win of the Legislature,” and “the statute law of the-grant forms the law of the case.” McLaren v. Pennington, 1 Paige, 102.
III. The effect upon a corporation of a Legislative dissolution and) repeal, is to terminate the power of the corporation. Crease v. Babcock, 23 Pick. 334, 346; Greenwood v. Freight Co., 105 U. S. 13, 18. There is no general or special law of this State which authorizes " unincor *215 porated private persons” to operate a street surface railway, nor can the purchaser under a foreclosure sale of such railway constitute a new corporation authorized to operate the same: Laws of 1884, chap. 252; Laws of 1874, chap. 430, § 1.
IV". Upon the repeal of the charter and the dissolution of a street surface railroad corporation, what becomes of the franchises of the corporation ? ‘ ‘ When it appears that the liberty has been once granted and is forfeited, the judgment shall be that it be seized into the King’s hands.” Year Book, 15 ed., 4, cited in Tidd on Corporations, 407. Although the franchises themselves are not thereby destroyed, for they exist in the hands of the State, and may be afterwards granted to the same or other individuals. The existence of the corporation is terminated.” State Bank v. State, 1 Blackf. 267; Erie v. Casey, supra. “ A corporation may be dissolved by misuses or abuses, for, as all franchises flow from the bounty of the Crown, so there is a tacit or implied condition annexed to such grants, which, if broken, forfeits the whole franchise.” Bac. Abr. Corp. F. “The grant is indeed only during the life of the corporation, which may endure forever; but when that life is determined by the dissolution of the body, the grantor takes it back by reversion, as in the case of every other grant for life.” 1 Bl. Comm. 484. The franchises of operating a railway in a public highway and of taking tolls thereon, therefore, reverted to the State, and might be lawfully reconveyed by it.
V. If the franchises so reverted, can they thereafter be possessed and enjoyed, as against the State, by mortgagees and lessees by virtue of mortgages and leases executed by the corporation prior to its dissolution ?
1. “ The wisdom, justice, or expediency of the passage of an act of the Legislature is not the subject of debate in courts of justice.” Erie v. Casey, supra; McLaren v. Pennington, supra; Miners’ Bank v. U. S., supra; Crease v. Babcock, supra; Greenwood v. Freight Co., supra; Lothrop v. Steadman, supra; DeCamp v. Eveland, 19 Barb. 81; Rumsey v. People, 19 N. Y. 41.
2. “A final judgment of seizure as forfeited is not essentially necessary to create the forfeiture.” King v. Amery, 2 Term Reps. 515, 567; Crease v. Babcock, supra; Lothrop v. Steadman, supra; Matter of Brooklyn, etc. Ry. Co., 72 N. Y. 245; Brooklyn v. City, 78 Id. 529; Erie v. Casey, supra; Miners’ Bank v. U. S., supra; Read v. Frankfort Bank, 23 Maine, 318.
3. In view of the repeated assertion of the existence of a power to repeal and dissolve, it is not to be presumed that there lurks in the provisions for its exercise a subordinate power in third parties to render the repeal and dissolution absolutely ineffective, or to raise on the *216 ruins of the dissolved corporation a new body beyond the power of the Legislature to control, and whose user of the thus reclaimed franchises is to be without responsibility and of endless duration. Such a nullifying presumption lacks as yet the support of judicial approbation. 1. “A chartered right of acting with impunity is derogatory to the spirit of our government. It would require the most unequivocal terms to induce a belief that the Legislature that gave the charter contemplated the conferring .of such dangerous and destructive privileges. It cannot be supposed that the Legislature intended that the State should pay the debts in order to enable it to proceed against the corporation for any violation of its charter.” State Bank v. State, supra. 2. “If the railway itself were the private property of the stockholders -or through them of mortgagees and lessees —“then it remains theirs, and they may use it without a charter—run it on their own account.—charge what tolls they please—close it or open it when they think proper—disregard every interest except their own. The repeal of charters on such terms would be courted by every railroad company in the State, for it would have no effect but to emancipate them from the control of law, and convert their limited privileges into a broad, unbounded license. On this principle, a corporation might be rewarded, but never punished for misconduct. If the stockholders had a right to retain the franchise, the charter could not be repealed at all with or without compensation.” Erie v. Casey, supra.
3. “It would be a doctrine new in the law that the existence of a ¡private contract of a corporation should force upon it a. perpetuity of «existence, contrary to public policy and the nature and objects of its .charter.” Mumma v. Potomac Co., 8 Pet. 281.
4. The franchise is held subject to a power in the State to withdraw it, and subject to be changed, modified or destroyed at the will of its grantor or creator. The right to withdraw a franchise must authorize a withdrawal of every or any right or privilege which is a part of the franchise.” Railroad Co. v. Georgia, 98 U. S. 359.
5. In Greenwood v. Freight Co. (supra) the argument was that it “ could not be contemplated that any of the franchises could be exercised without the expenditure of money”—i. e., borrowed or otherwise— and that “it could not be held that such expenditure conferred upon the corporation (or through it upon the lender) a perpetuity of existence, and deprived the reserved power of the Legislature of its full force;” and the decision is an adoption of the argument.
6. In Worcester v. Worcester (109 Mass. 103) the court said, with reference to the suggestion that the lessees of the corporation, whose charter was held to be amended under the reserved power of the *217 'legislature, were affected in their contract rights by such amendments: “ All these parties have derived their interests from the original cor.porations, and they hold these-assigned and derivative interests under express or implied authority, granted to those corporations by the legislature. Yet none of these leases or assignments can be construed to extend to the lessees or assignees the- power to exercise the right of eminent domain, or to restrict the right of the Legislature to alter or repeal the charters. Their rights are subordinate to that right, and, if «the Legislature shall see fit to exercise it, they are not bound to give ¡notice to any of these parties.”
7. The question of what becomes of the property of a corporation when it forfeits its franchises was before the court in Ohio, in N. Y., P. & O. R. R. Co. v. Parmelee (15 Weekly Law Bull. 239), where it was held that by virtue of a decree of ouster by the supreme court of the right of the Ohio and Pennsylvania Canal Co. to, and its privilege in maintaining, the Ohio and Pennsylvania Canal, and its right to be a corporation of the State (23 O. S. 121), there was a forfeiture of the easement of the canal company, and the land reverted to the devisees of the original owner of the title, freed from the imcumbrance and burden of the easement. The ouster in this case was adjudged on the -ground that the corporation had abandoned its line. . . .
8. In West Co. v. Board (35 Wis. 257, 271; affirmed 93 U. S. 595) this language was used : “ But the counsel for the plaintiff company insist that the particular exercise of this reserved power m withdrawing the exemption was invalid, because it destroyed vested rights. The company proceeded to place in the market its bonds to raise money for the completion of its road, which said bonds were secured by a mortgage on said lands, and were sold to the amount of several millions of dollars, mainly by reason of the immunity of the land grant from taxation. The original corporators, or subsequent stockholders, or bondholders, took their interests with knowledge of the existence of this reserved right on the part of the State of repealing the exemption acts, and of the possibility of its exercise at any time in the discretion of the Legislature. A repeal of the act of incorporation would likewise affect the value of the bonds and of the security. But this consideration could have no weight in determining the question whether the Legislature might not revoke or change its own grant of corporate rights. The whole charter would still be subject to revocation or alteration at the will of the Legislature, and the fact that the rights of bondholders would be incidentally affecced by the exercise of this power on the part of the Legislature could make no difference. The matter would still be within the control of the Leads *218 lature, although that result might follow from its act withdrawing the-corporate grant.
9. In Silliman v. F. O. & C. R. R. Co. (27 Gratt. 119) the court said: . . . “ Though the authority to execute the bonds and the mortgage in favor of the company, and the condition of forfeiture in favor of the State, are contained in different sections, they are both parts of the same act, and in fact constitute one contract, and must be taken and construed together as parts of a whole, so that, if possible, effect be given to the whole and to every part. If the act should be construed as investing the company with the right to alien or mortgage all its franchises, rights and property, free from the right of the State to a forfeiture of the same, if the road was not completed within the prescribed time, the fifth section would be wholly inoperative. It gives-no security to the State that the money authorized to be borrowed would be faithfully applied to the completion of the road, or that the-road would be completed within the time limited, which seems to have been the cardinal object of the Legislature in confirming the charter of this company, and in extending aud enlarging its franchises. What assurance could it give ? The very property which is to be forfeited to the State by the company, on its failure to comply with the condition, becomes vested in others by the mortgage, and leaves nothing for the-State. For it is very evident that the foreclosure of the mortgage-by sale would leave nothing for the equity of redemption upon which-, the forfeiture could operate. But the idea that only the equity of redemption was to be subject to forfeiture is repugnant to the very terms-of the act, which require the forfeiture, not of the equity of redemption, but of the identical subject which the second section authorized-to be conveyed in trust or mortgage. Such an idea is also incompatible-with the last clause of the section, which provides that upon such forfeiture the State of Virginia shall have right- to enter upon and take-possession of said railroad track, road bed, etc., and hold the same as a-trustee for the benefit of herself, the corporation of Fredericksburg,, and the other private stockholders ; which she could not do if the forfeiture was subject to the mortgage, and the railroad track, road bed and all the property had been conveyed to others, and were liable any hour-to be sold toward satisfying the mortgage. Taking both sections together, they must be construed to give to the company the right to-mortgage the property, subject to the State’s right of forfeiture, in-, case the road is not completed by the time specified. It is evident that the 'company so understood it. . . . The Legislature did not intend to-grant the privilege, except with this restriction. If the company did, not regard it as beneficial they were under no constraint to take- it. They must have regarded it as conferring a benefit, or they would not *219 have accepted it. It is true the restriction, if it were known (and the company was bound in common honesty to make it known), would embarrass the sale of the bonds. They could not be sold at all, perhaps, if thrown upon the market. No one could be induced to purchase who could not repose a personal confidence in the company that every dollar so raised would be strictly applied to the completion of the railroad in compliance with the terms of the charter, and thus save the forfeiture. If the bonds could be sold, and the money faithfully and honestly so applied, the security would be greatly strengthened, and the property and franchises saved from forfeiture, and the loan would be amply secure. A loan upon such security could only be effected, through the personal confidence reposed in the company by the lender, or the purchaser of the bonds, that the money would be faithfully and honestly applied. And it may be that the company in accepting the act calculated that they would be able to raise the money from those-who knew them and who would confide in them; that they would honestly apply the money so raised, as required by the law which, authorized them to make the loan, and in a way that would give ample security to the holder of the bonds. They could not have expected to-raise the money by throwing the bonds upon the general market. . . . They [the bondholders] may be presumed to have had actual notice of said restriction on the power of executing a mortgage. If they had not such notice it was their own fault. Persons dealing with corporations must take notice of whatever is contained in the law of their organization, and they must be presumed to be informed as to the restrictions or conditions annexed to the grant of power, by the law by which the-corporation is authorized to act. Pearce v. Madison & Ind. R. R. Co., 21 How. (U. S.) 441 ; Zabriskie v. Cleveland R. R. Co., 23 How. (U. S.) 381. In every instance (Mr. Justice Miller said, in delivering the opinion in which a majority of the court concurred, in the Floyd accept, ances case (7 Wall. 680), a person making a contract with the government, through its officers or agents, must look to the statute under authority of which the agent or officer professes to act, and see-for himself that his contract comes within the terms of the law. The-same rule would apply, a fortiori, to persons making contracts with, the agents or officers of bodies corporate. Mr. Justice Miller further holds, in the above case, that the contract by bill of exchange stands on no different footing, with reference to the authority of the officer, to bind the government. And again : ‘ One who takes a negotiable note or bill of exchange, purporting to be made by an agent, is bound to enquireas to the power of the agent ’ (see also Olds v. Cummings, 31 Ill. 188, 192 ; 42 Id. 273 ; Westfall v. Jones, 23 Barb. 10). In Clark v. City of Des Moines, 19 Iowa, 199, 209, the corporation is bound only when its. *220 agents keep within the limit of their authority. And again : ‘ Negotiability will not validate obligations which are not binding for want of power to issue them. Gould v. Town of Sterling, 23 N. Y. 439, 452, 464 ; s. c., 1 Am. L. Reg. (N. S.) 290. Coupon bonds are put upon the footing of negotiable instruments, and are not liable in the hands of an innocent holder to the equities which attach to ordinary bonds. But their negotiability cannot enable the holder to subject property conveyed by deed of trust or mortgage for their security, which the grantor had no right to convey, or where he had a right to convey under restrictions or conditions, no further than the restrictions or conditions will allow. Every purchaser of railroad bonds should look to the charter or statute under authority of which they were issued and the mortgage was given to secure their payment. The court is of opinion that no constitutional question is involved in this case with regard to the impairment of contracts. The construction given to the fifth section of the act is a construction given to the contract itself, for it is a part of it, and a stipulation which is a part of a contract, though it may modify it, or make the contract different from what it would be without it, cannot be said to impair the obligation of the contract. The court is also of opinion that the company, having failed to complete the railroad from Fredericksburg to Orange Court House in the manner prescribed by the Act of February 21, 1872, by July 1, 1873 (the extension of time allowed by the Act of March 26, 1873), the forfeiture •on that day become absolute and complete. And the State having entered and elected to hold to the forfeiture, ‘no inquisition, or judicial proceedings, or inquest, or finding of any kind was required to consummate such forfeiture.’ Staats v. Board, 10 Gratt. 400; Wild’s Lessee v. Serpell, Id. 405 ; Hale v. Branscum, Id. 418.”
10. In Read v. Frankfort Bank (23 Maine, 318, 320), the court said: . . .
“It is not contended that the bank had not exposed itself, so that its charter was properly revoked, or that all the necessary steps were not taken by the Legislature, agreeably to the general statute of 1831, previous to the repealing act; and in default of evidence to the contrary, it must be so presumed. . . . After this, the creditors of the bank cannot object to the constitutionality of the act, dissolving the corporation, when it was done for causes which, by the charter were sufficient for the purpose, and when the repeal was conclusive upon the bank. Indeed, it is not seen how any objection can be' made by those who bad no other connection therewith than that of being its creditors. Whoever entered into contracts with it exposed himself to losses which might arise from its dissolution, as he would with natural persons by their death. . .' . The bank was created by the Legislature, and by the charter there was no provision *221 made for the prosecution of suits against it, if that charter should be-declared by the same power forfeit and void; but a mode has been provided in the repealing act by which creditors are enabled 'to-obtain satisfaction for their claims, to the extent of the means existing therefor. A remedy for a party may be changed or wholly taken away by the Legislature without contravening the Constitution of the United States. Thayer v. Seavey, 2 Fairf. 284; Oriental Bank v. Freese, 18 Maine, 109.”
11. “ The reserved power to repeal and dissolve, as it underlaid the-charter of the corporation, also underlaid and was incorporated in all its contracts. The right to exercise the reserved power was part of the charter contract.” Northern R. R. Co. v. Miller, 10 Barb. 260, 282. “ When the charter contains such a stipulation, it is as much a part of the contract as anything else that is in it. Its exercise is merely carrying out the contract according to its terms, and the State is using her own rights.” Erie v. Casey, supra; Pennsylvania College Cases, supra; Cable Co. v. Chambers Street, supra. If the franchise is terminated by dissolution, mortgagees and lessees are bound thereby, because the franchise springs from the charter and not otherwise. The death of the original grantor and the revocation of its franchises revokes the franchise in the hands of a subsidiary grantee. “The reservation affects the entire relation between the State and the corporation, and places under Legislative control all rights, privileges and immunities derived by its charter directly from the State.” Tomlinson v. Jessup, 15 Wall. 454. The rights of mortgagees and lessees to exercise the franchises of operating a railway are of necessity derivative only, and, when the fountain is closed by the Legislature, nothing further can be derived therefrom. Neither the mortgagees nor lessees have now any derivative right to exercise the franchises.
VI. , Franchises are ' incorporated rights. The right to use them does not ex vi termini import a right of alienation. The latter right, it is now settled, is not inherent, but must repose on statutory authority. Such authority was given by section 28 of the General Railroad Act of 1850, as amended by chap. 133 of the Laws of 1880, and, as so amended, it is:
“ 10. From time to time to borrow such sums of money as may be. necessary for completing and finishing or operating their railroad, and to issue and dispose of their bonds, for any amount so borrowed, and to mortgage their corporate property and franchises to secure the payment of any debt contracted by the company for the purpose aforesaid; and the directors of the company may confer on any holder of any bond issued for money borrowed as aforesaid the right to convert the principal due or owing thereon into stock of said company. *222 at any time not less than two nor more than twelve years from the date of the bond, under such regulations as the directors may see fit'to adopt; provided, however, that if the already authorized capital stock of such corporation, at the time such bonds may be issued, shall not be sufficient to meet such conversion when made, the stockholders shall, before such issue, and in the manner hereinbefore provided, authorize an increase of capital stock to an extent sufficient to meet the deficiency.”
This statute must be taken as a unit, and so taken, it is alleged in this case to be an expression of the will of the Legislature that the franchises should survive the death of the life tenant or tenant at will, and that the derivative title should survive the destruction of the original title.° To this suggestion it may be answered:
1st. That the argument is novel, and aside from this particular case, is not supported by any reported authority. It has neither precedent nor analogy to sustain it.
2nd. It proves too much. It assumes that an individual may operate a street surface railway and collect tolls thereon, when such right is by statute confined to corporations authorized to be formed for that purpose.
3rd. It assumes that the bondholders may foreclose and reorganize ¡as a successor corporation, which by statute (Laws of 1874, ch. 430) they are not permitted to do.
4th. It legislates into the statute, what is not to be found there, a power in the life tenant or tenant at will to perpetuate his franchises as against the State beyond the termination of the tenancy.
5th. If the bonds were convertible into stock it suspends the power of repeal and dissolution for twelve years, and keeps the company alive for the same time so as to permit the bonds to be converted.
6th. It gives to an individual State franchises in perpetuity, and. places them and their owner forever beyond the control of the State, and it legislates into existence a new order of derivative franchise owners, whose title is superior in its perpetuity, and its indefeasibility to that of the original grantee.
7th. It nullifies the letter and intent of the pre-existing legislation of sixty years. What such intent was is stated in Tomlinson v. Jessup (15 Wall. 454), as follows: “ The object of the reservation and of similar reservations is to prevent a grant of corporate rights and privileges in a form which will preclude Legislative interference with their exercise, if the public interest should at anytime require such interference.” How futile are the object and the laws intended to effect it, if both can be circumvented by an ascription of intention not evinced by the reset *223 vation and which calls into being an individual or a body beyond the reach or control of the law.
8th. In this State the question is res nova. It is believed to be so elsewhere, save as it is answered by the authorities above referred to. It is not believed that any adjudication exists which sustains the imputation of such a suicidal Legislative act, as deducible from the simple grant of a power to mortgage. In New Orleans, etc. R. R. Co. v Delamore (114 U. S. 501) . . . the company was adjudicated a bankrupt under the act of Congress and its right of way was sold when the consent had twenty-one years to run, and the company had twenty-one years to live. An adjudication of bankruptcy under the Federal law does not dissolve the corporation, and after it is made, the company qua company still lives (Allen v. Ward, 10 B. R. 285), precisely as an individual fives who has been adjudicated a bankrupt. The purchaser under the bankruptcy sale, after receiving a deed, mortgaged the property. The mortgage was foreclosed, and the court held that the right to the continued enjoyment of the still existing twenty-one years of the corporate fife, passed by both sales to the purchaser under the foreclosure. The court did not decide that, after the expiration of the fife of the company by the passage of the twenty five years, the purchaser or any one else would have a right to the further enjoyment of the consent. The question was not before it. It is very evident, however, that the'municipality well understood what would be its right on the death of the corporation at the end of the twenty-five years, for it put in its consent this provision: “ On the exjuration of said right of way, the road, etc., may be taken by the city at an appraised value,’’ etc. This established its position, that the consent to the right of way did not survive the fife of the corporation, which is the question here and which has not been passed upon by the supreme court.
9th. It results, therefore, that there is neither statute which pro. vides, nor adjudication which holds, that the right to repeal, annul and dissolve, shall be or is nullified by a right to mortgage, and that a trustee takes a perpetual franchise, which in his hands is above.and beyond the law. In - further illustration, suppose that the time fixed in the charter had expired, and that the mortgage debt had not been paid. That supposition presents the identical question : Could the trustee take possession, and thereafter and forever operate the road and collect tolls thereon, and simply keep his interest paid; or could he sell under the foreclosure and give the purchaser the franchises, to be by him enjoyed in perpetuity, and beyond the power of recall or control ? That is the question which was presented to the Legislature. It is believed that as yet it has not been finally answered, and certainly *224 not in the, affirmative, by the courts of any State, or of the Unitedi States.
VII. What is the" effect upon a municipal consent of the death by Legislative act of the corporation to which the consent was given ? The-question is to be answered without any reference to mortgages, and it. is to be decided whether such consent is property which survives and. enures to the benefit of creditors and stockholders.
The consent is only a license. Chicago City Railway Co. v. People, 73 Ill. 541, 542; Metropolitan City R. Co. v. Chicago West Division R. Co., 87 Ill. 317, 322; Buffalo City Co. v. N. Y. Cent. Co., 22 Alb. L. J. 134. What then could the purchaser obtain ? Not a franchise-to operate a railway and to collect tolls, for that the municipality could not give him. Not even the ability to restrain others in the given, locality, for the consent was not and could not be exclusive. He would take simply and only the consent without the right, power or authority to do a single act by virtue of its purchase. This barren possessory right could not be regarded in any juridical sense as “ property ” to. which any ownership and use" as such could appertain. Under this state of the facts and the law, what the Legislature, not being prohibited from annexing further conditions not inconsistent the city’s consent (Matter of Thirty-fourth Street R. R. Co., 102 N. Y. 343, 350, 351), might lawfully say, as it did in effect say? “This municipal license is not an asset in the estate of the deceased licensee. Apart, from franchises, which we alone can grant, it is absolutely useless. As, however, the municipal consent, together with that of the General Term, were procured and granted after full compliance with both, constitutional and statutory requirements, and were both given for a. railroad in Broadway, we will provide that the right to the further enjoyment of such consents shall not be terminated by the death of the licensee ; that it shall not be necessary to procure a new consent for such a railroad ; that such rights may be sold by the licensor to any new licensee incorporated under the Street Surface Railway Act of 1884 (chap, 252), so that such incorporated purchaser may again unite the-State franchises with the municipal license.”
VIII. The regulations in chapter 310 of the Laws of 1886, in reference to the proof of debts claimed to be due from corporations which, have been dissolved by Legislative enactment, are valid They are in close conformity with the provisions of 2 R. S. 462, 469 ; 42, § 7 ; 41, § 5, §§ 19, 25.
[For the most recent cases on the effect of dissolution, forfeiture,, division, consolidation, etc., see Slattery v. St. Louis, etc. Transportation Co. (Mo. 1887), 4 Southwestern R. 79; Island City Sav. Bk. v. Sachtleben *225 (Texas, 1887), 3 Id. 733 ; Neilson v. City of Newark (N. J.), 8 Atlantia R. 292; Society Perun v. Cleveland (Ohio), 1 Western Rep. 506. See also the following cases: Under the Virginia Act of 1849 no forfeiture of the title of an insolvent corporation to land condemned by it, on the ground of abandonment, can be enforced except by the State, and on payment to .the company of the value of the property. McConihay v. Wright Bk., 30 U. S. (L. ed.), 932. Dissolution as terminating exclusive right of names. Re First Presbyterian Church (Pa.), 2 Centr. Rep. 40. Equitable power of the court to distribute foi? benefit of stockholders and creditors, the assets of a dissolved corporation. St. Louis, etc. Min. Co. v. Sandoval, etc. Min. Co. (Ill.), 2 West. 920; Stamm v. Northwestern Mut. Ben. Asso. (Mich.), 8 West. 767; Crumlish v. Shen. Val. R. R. Co., 28 W. Va. 623.
• [In 21 Abb. N. C. 127, will be found a note on the Devolution of Corporate Property, on consolidation or dissolution.]
6. Form of judgment of forfeiture (in People v. North River Sugar Refining Co.).
The adjudicating clauses of the judgment in the case in the text, were as follows (appropriate title and recitals prefixed being here omitted). See opinion on p. 209.
It is adjudged and decreed that the defendant has offended against the provisions of the act under which it was created and has violated provisions of law whereby it has forfeited its charter and become .liable to be dissolved by abuse of its power.
And it is further adjudged and decreed that the said defendant, The North River Sugar Refining Company, be, and the same is hereby, dissolved, and its corporate rights, privileges and franchises forfeited to the People of the State of New York.
And it is further adjudged and decreed that the said defendant,. The North River Sugar Refining Company, its trustees, directors, managers and other officers, attorneys and agents, be, and each of them hereby is, forever restrained and enjoined from exercising any of the corporate franchises, power, rights, or privileges of the defendant, and from collecting or receiving any debts or demands belonging to or held by the defendant, and from paying out, or in any manner interfering with, transferring or delivering to any person, any of the deposits, moneys, securities, property or effects of the said defendant or held by it.
It is further adjudged and decreed that Henry Winthrop Gray, Esq., of the City of .New York, be and he is hereby appointed receiver of all the property, real and personal, things in action and effects, of the said corporation, The North River Sugar Refining Com *226 pany, held by and vested in it, or to which it may be in any wise interested or entitled, with the usual powers and duties enjoyed and exercised by receivers, according to the practice of this court and of the statutes in such cases made and provided.
It is also adjudged and decreed that, before entering upon the duties of his trust, such receiver execute and file with the clerk of New York County a bond, with at least two sufficient sureties to the People of the State of New York, in the penal sum of §100,000 conditioned for the faithful discharge by said receiver of the duties of his trust; such bond to be approved as to its sufficiency, form and manner of execution by a justice of the supreme court. Upon the filing of such bond thus approved, the said receiver is authorized and directed to take possession of and sequestrate the property, things in action and effects, real and personal, of the defendant .herein, and to take and hold all property held by or in possession of said defendant corporation and to secure and reduce to possession all property to which said corporation maybe entitled ; that an account of the assets and property and debts and liabilities of said defendant be taken, and that the property of such defendant be distributed among its stockholders or persons lawfully entitled thereto, fair and honest creditors, in the order and proportions prescribed by law in case of the voluntary dissolution of a corporation.
It is further adjudged and decreed that such further applicacation may be made to this court under the provisions of this decree or order as the receiver may be advised is proper and necessary for his instruction in the,management and conduct of his trust.
It is further adjudged and decreed that no application shall be made to any court against the receiver relative to, or in any way connected with, the duties of said receiver, or of the funds or assets of the defendant above mentioned, or their transfer, sale or delivery, unless at least five days’ notice of such application be first given to said receiver and to the attorney-general of the State of New York and the defendant’s attorney.
It is further adjudged and decreed that said receiver proceed according to law to convert into money all the property and assets held or owned by said defendant or to which said defendant may be in any wise entitled, and forthwith, upon receiving such money, he shall deposit the same in the United States Trust Company of the City of New York to the credit of said receiver, to be held by him subject to the further order of the court, and said money so deposited, as aforesaid, with said Trust Company, shall not be delivered over by it, unless the check, draft or demand therefor be accompanied with a certified copy of an order of this court directing such payment, said order to be *227 made only on notice to the attorney-general and the defendant’s attorney.
And it is further adjudged that the plaintiffs, the People of the State of New York, recover of the defendant, The North River Sugar Refining Company, the sum of dollars and cents, costs and disbursements of this action, which said sum the said receiver is hereby directed to pay to the' attorney-general.

 Stated on p. 165 (above).

 See also People v. Boston, Hoosac Tunnel, etc. Ry. Co., 12 Abb. N. C. 230.

 See Note on the Devolution of the Property and Eights of a Corporation in 21 Abb. N. C. 127; also note on Franchises and their Survival at the end of this case.

 Aff’g, 35 Hun, 421.

 See the following cases bearing on this point: Kelsey v. Pfaudler Process, etc. Co., 19 Abb. N. C. 427; MacKinnon Pen Co. v. Fountain Ink Co., 48 Super. Ct. (J. & S.) 442 ; Ebling v. Bauer, 17 Weekly Dig. 497; Bingham v. Maigne, 52 Super. Ct. (J. & 8.) 90; Livestock Assoc. v. Levy, 3 N. Y. State Rep. 514. See also an article by Prof. Dwight on “The Legality of Trusts,” in 3 Political Science Quarterly, No. 4, p, 592.

 See also Arnot v. Pittston, etc. Coal Co., 68 N. Y. 558; which was followed in Raymond v. Leavitt, 46 Mich. 447 ; s. c., 41 Am. R. 170 ; *201 McBirney & Johnston White Lead Co. v. Consolidated Lead Co., 9 Crim. Law Bul. 310; and see Standard Oil Co. a. Scofield, 16 Abb. N. C. 372 ; Keene v. Kent, 4 N. Y. State Rep. 431.